PORTLAND AUDUBON SOCIETY; Headwaters; The Wilderness Society; Sierra Club, Inc.; Siskiyou Audubon Society; Central Oregon Audubon Society; Kalmiopsis Audubon Society; Salem Audubon Society; Umpqua Valley Audubon Society; Natural Resources Defense Council; Lane County Audubon Society; Oregon Natural Resources Council, Plaintiffs–Appellants,

v.

Manuel LUJAN, Jr., in his official capacity as Secretary, United States Department of Interior, Defendant–Appellee,

and

Northwest Forest Resource Council; Huffman and Wright Logging Company, et al.; Association of O & C Counties, et al.; Douglas County Forest Products, et al., Defendants–Intervenors–Appellees.

No. 89–35337.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 17, 1989.

Decided Sept. 6, 1989.

**1234**

Victor M. Sher, Sierra Club Legal Defense Fund, Inc., Seattle, Wash., for plaintiffs-appellants.

Martin W. Matzen, Dept. of Justice, Washington, D.C., for defendant-appellee Manuel Lujan, Jr.

Phillip D. Chadsey, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for defendants-intervenors-appellees The Ass'n of O & C Counties, et al.

Mark C. Rutzick, Preston, Thorgrimson, Ellis & Holman, Portland, Or., for defendants-intervenors-appellees The Northwest Forest Resource Council, et al.

Before GOODWIN, Chief Judge, SCHROEDER and PREGERSON, Circuit Judges.

GOODWIN, Chief Judge:

On remand from this court's decision in *Portland Audubon Society v. Hodel*, 866 F.2d 302 (9th Cir.1989), the district court took testimony, examined exhibits, reviewed the applicable law, and concluded that section 314 of Pub.L. No. 100–446, 102 Stat. 1774, 1825 (1988), barred plaintiffs' National Environmental Protection Agency (NEPA) claim. The district court also concluded that plaintiffs' other claims were untimely. Plaintiffs were seeking to enjoin the removal of timber from certain government-owned lands pursuant to current Timber Management Plans (TMPs) and their respective annual allowable harvest targets. After staying further logging pending this expedited appeal, we have reviewed the record, the briefs and arguments, and we affirm the district court's denial of relief on the NEPA claim. We remand plaintiffs' other claims for further proceedings.

*The Timber Management Plans*

From 1979 to 1983, the Bureau of Land Management (BLM) adopted ten-year plans for each of its districts in western Oregon. These Timber Management Plans (TMPs) were received in evidence as exhibits. Each was the result of a lengthy process that included the preparation of an Environmental Impact Statement (EIS) as required by the NEPA, 42 U.S.C. § 4332. Each EIS considered the environmental impacts of possible timber management alternatives, including "maximum timber production," "no change [from present management]," "no herbicide," "emphasis on protection of natural values," "habitat diversity," as well as management alternatives which would compromise among these concerns.

Among the numerous environmental impacts studied under each alternative was the depletion of northern spotted owl habitat and the resulting predicted decline in the number of owls on BLM lands.

Each TMP adopts one of the alternatives proposed in the EIS, though perhaps with slight modifications. The TMPs designate commercial forest land under BLM management in the district for one of several uses. For example, the Roseburg District TMP, adopted September 30, 1983, sets aside 82 percent of the commercial forest land area for "intensive timber management." Another 9 percent is to be managed for "modified area control," which allows some timber harvest while protecting some old-growth timber and visual corridors.[1] An additional 9 percent of

---

1. Land that will support a sustainable annual yield of 20 cubic feet of timber per acre is considered "commercial forest land."

"Intensive timber management" in Pacific Northwest old-growth forests includes clearing the land of centuries old trees, replacing these with uniform-age new growth, and then forest management to culminate in harvesting in 40 to 80 year cycles depending on the growth characteristics of each "second growth" forest.

"Visual corridors" refers to the practice of leaving a corridor of uncut trees along a high-

way so that an unsightly clear cut is not visible to the automobile driver.

Plaintiffs remind us that the TMPs do not designate any particular timber sales, or require that any particular timber be cut. The nature of timber harvesting does not lend itself to specific designations until market access, fire, insect invasion and other factors are taken into account. *See, e.g., Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417 (9th Cir. 1989) (timber sale necessitated by bark beetle infestation which followed violent storm). A particular stand of

the commercial forest land is withdrawn from timber production altogether, because the land is in riparian areas, because it is fragile and incapable of supporting sustained yield timber management, or because the land is reserved for endangered species habitat or for recreation.

Although the TMPs do not designate specific timber sale boundaries, or require that BLM sell any particular acre of timber, they effectively decide the land use allocation of the forest and set the "annual allowable harvest" for each district. BLM timber sales are carried out in accordance with the plans. Each timber sale requires an Environmental Assessment which is "tiered" to the EIS for the TMP. In other words, when BLM sells an individual timber sale, it does not revisit the difficult trade-offs and decisions that were made in the TMP, deciding what land is to be designated for "intensive timber management." The Environmental Assessment considers site-specific concerns about how the sale is to be undertaken in accordance with BLM management practices: where roads are to be built, how the site is to be prepared, how to mitigate the environmental impact of the sale by reducing erosion, muddying of nearby waters, or an overly visible, unsightly cut.

In 1986, BLM decided to replace all of the current western Oregon TMPs with new, coordinated plans by the end of the decade. The EISs for the next generation of plans are currently being prepared and, if all goes according to schedule, should be completed in 1990. *See Portland Audubon Society v. Lujan,* 712 F.Supp. 1456, 1460–61 (D.Or.1989).

*The Northern Spotted Owl*

The northern spotted owl is heavily dependent on old-growth timber for its habitat. The owl is considered an "indicator species" for old-growth forest, meaning that the presence and number of northern spotted owls give an accurate indication of the health of the old-growth forest and the presence of other old-growth dependent species. As go the owls, naturalists say, so go the other species.

Almost no old-growth forest remains on private lands in western Oregon. Most of the remaining old-growth timber is on federal land managed by the Forest Service and BLM. BLM lands account for approximately one-fifth of the remaining old-growth timber.

During preparation of the 1979–1983 EISs and TMPs, the preparers recognized that the TMPs called for accelerated harvesting of much remaining old-growth timber, and that the number of nesting pairs of spotted owls would decline as this harvesting took place. The EISs and TMPs reflect this concern, and attempt to make provisions for the preservation of a specified number of owl pairs.

In the mid–1980s, several studies expressed concern for the long-term viability of the northern spotted owl species. Dr. Russell Lande of the University of Chicago completed a much-debated study on the likely extinction of the owl. The National Audubon Society commissioned an independent report which concluded that extinction is a possibility because of the owl's dependence on old-growth forest and its low rates of reproduction even in undisturbed forest.

At the request of environmental groups, including plaintiffs in this litigation, BLM prepared an Environmental Assessment in order to determine whether, in light of new information about the owl, supplemental EISs should be prepared for the TMPs. BLM provided interim protection for owl sites pending completion of the Environmental Assessment. The Spotted Owl Environmental Assessment was completed on February 3, 1987. It concluded that any new information about the owl was too preliminary to support preparation of a supplemental EIS, and that the impacts of planned timber sales on spotted owl habitat were no worse than had been predicted under the original EISs. On April 10, 1987, BLM issued its decision not to prepare a supplemental EIS on the owl, finding that a

---

timber can be cut only once every 40 to 80 years, and the ten-year TMPs do not determine which exact stand of timber will be cut in which

year. The plans do, however, determine which areas will be devoted to timber production and which to other uses.

supplemental EIS would not serve any purpose because

> [t]he conclusions of the [Spotted Owl Environmental Assessment] indicate that by the time BLM completes new resource management plans for western Oregon, more spotted owl habitat will be available than had been predicted to survive in the EISs, and substantial options for protecting the spotted owl population on BLM lands can be addressed in the new [resource management plans] and related EISs at that time. The analysis also shows that 913,000 acres of unsold old growth and mature timber now in existence on BLM lands in western Oregon will be reduced by no more than 9% by October 1990, leaving 91% of that particular habitat that exists today available for planning options for the [resource management plans] scheduled for completion in 1990.

Portland Audubon Society appealed this decision to the Interior Board of Land Appeals and requested immediate stay of timber sales near identified spotted owl nests. The Interior Board of Land Appeals eventually, on February 28, 1988, upheld the decision not to prepare a supplemental EIS. Meanwhile, on October 19, 1987, plaintiffs had filed this action alleging violations of NEPA, the Oregon & California Lands Act (OCLA), 43 U.S.C. § 1181, the Federal Lands Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 et seq., and the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703 et seq.

The district court entered judgment for defendants on April 20, 1988, after granting defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), on the ground that judicial review of plaintiffs'

claims was barred by section 314 of the 1987 interior continuing budget resolution. *See* Continuing Resolution, H.R.Res. 395, § 314, Pub.L. No. 100–202, 101 Stat. 1329, 1329–254. That section was reenacted without change in 1988 as section 314 of Pub.L. No. 100–446, 102 Stat. 1825.[2] The district court relied on legislative history, particularly the 1987 Senate Report, S.Rep. No. 100–165, 1st Sess. 11–12 (1987), indicating that sponsors of section 314 intended to bar this very lawsuit. The district court characterized this as an action brought "on the sole basis of new information concerning the northern spotted owl." The district court did not discuss whether this suit was one challenging particular activities to be carried out under the existing plans, which challenge section 314 expressly permits.

*PAS I*

We reversed and remanded. *Portland Audubon Society v. Hodel,* 866 F.2d 302 (9th Cir.1989) ("*PAS I*"). We found the language of section 314 "anything but clear" and cautioned that the court must examine the language of the statute and assess whether, following principled methods of statutory interpretation, the withdrawal of jurisdiction bars each of plaintiffs' claims.

Section 314 prohibits challenges to a BLM plan "solely on the basis that the plan does not incorporate information available subsequent to the completion of the existing plan." At the same time, it allows challenges to "any and all particular activities to be carried out under existing plans."

With regard to the NEPA claim, the district court had not considered whether this suit is a challenge to the plans barred by

---

**2.** Section 314 provides:

> The Forest Service and Bureau of Land Management are to continue to complete as expeditiously as possible development of their respective Forest Land and Resource Management Plans to meet all applicable statutory requirements. Notwithstanding the date in section 6(c) of the NFMA (16 U.S.C. 1600), the Forest Service, and the Bureau of Land Management under separate authority, may continue the management of existing lands within their jurisdiction under existing land and resource management plans pending the

> completion of new plans. Nothing shall limit judicial review of particular activities on these lands: *Provided, however,* That there shall be no challenges to any existing plan on the sole basis that the plan in its entirety is outdated, or in the case of the Bureau of Land Management, solely on the basis that the plan does not incorporate information available subsequent to the completion of the existing plan: *Provided further,* That any and all particular activities to be carried out under existing plans may nevertheless be challenged.

section 314, or a challenge to "particular activities" to be carried out under the plans. Because the plaintiffs attack numerous sales, the NEPA claim has the effect of an attack on the plan, yet it is phrased in terms of particular activities: plaintiffs seek to enjoin several hundreds of timber sales planned within 2.1 miles of owl sites. We did not resolve the "particular activities" issue, noting that the district court had not addressed whether timber sales are "particular activities" under section 314. We remanded so that the district court could make that determination.

*Remand*

On remand and after further factual development, the district court held that plaintiffs' non-NEPA claims were barred by the equitable doctrine of laches. *Portland Audubon Society v. Lujan*, 712 F.Supp. at 1482–84. The district court noted that the OCLA and FLPMA claims, 43 U.S.C. §§ 1181, 1701 et seq., challenge the Oregon BLM Director's 1983 Forest Resources Policy Statement (FRPS) requiring that all lands suitable for timber production be managed for timber and wood product production, to the extent possible under the requirements of law. *Id.* Similarly, according to the district court, the MBTA claim, 16 U.S.C. § 703, is based on "predictions of the demise of the spotted owl made in the [EISs] issued between 1979 and 1983." *Id.* The court concluded that

> the [Administrative Procedure Act] does not provide a basis for a challenge by [plaintiffs] to administrative decisions made over five years ago and upon which the BLM has operated without objection." In sum, since [plaintiffs] failed to pursue its claims under OCLA, FLPMA and the MBTA in a timely manner, they are not subject to this court's review under the APA.

*Id.* at 1484.

On remand of the NEPA claim, the court held that BLM's decision not to prepare a supplemental EIS in 1987 was not subject to judicial review in these proceedings. The court held that the suit was a challenge to the plans and not to "particular activities to be carried out under existing plans," and further, that the NEPA claim was based upon "new information." The court held the NEPA claim barred and granted summary judgment to BLM. *Id.* at 1485–89.

After unsuccessfully seeking a stay pending appeal in the district court, plaintiffs appealed and sought a stay pending appeal in this court. After considering the voluminous motion papers filed by all sides, we granted the stay and expedited the appeal, with briefing limited to the issues considered in the opinion of the district court.

*Section 314*

The district court's finding that plaintiffs' NEPA claim is based on "new information" is not contested in this appeal. Instead, the argument is focused on whether plaintiffs challenge the plans or "particular activities to be carried out under the existing plans."

Plaintiffs' NEPA claim is not phrased as a *direct* challenge to the existing plans. This does not, however, end the inquiry. If it did, we would not have remanded the case in order for the district court to determine how to apply the "particular activities" language to plaintiffs' NEPA claim.

The district court reads section 314 as barring any challenge to a sale unless a plaintiff can demonstrate new information "site-specific" to that timber sale. Plaintiffs argue that they have met even this test: they have identified specific sales that include old-growth timber in close proximity to an owl nest. Their new information is, they say, specific to each of these sales and their challenge thus has no bearing on BLM's other sales unless they also contain owl habitat.

In describing plaintiffs' claim as an attack on the plans, the government and the district court both begin with the text of section 314, as well as the legislative history of section 314. The district court attempted to "give meaning to the statute as a whole and avoid rendering any part of the statute inoperative or insignificant." *Portland Audubon Society v. Lujan*, 712 F.Supp. at 1488. The court interpreted section 314's language that "[t]he Forest Ser-

vice and [BLM] ... may continue the management of lands within their jurisdiction under existing land and resource management plans pending the completion of new plans" as expressing the affirmative intent of Congress to "prevent those kinds of disruptions to existing [TMPs] that preclude a smooth transition from one planning period to another." *Id.* This may be true, but a congressional intent that there be a "smooth transition from one planning period to another" is not specific enough to serve as a jurisdictional bar or to indicate how we should interpret the jurisdictional withdrawal provision contained in the latter part of section 314.

We do not find the above-quoted language of section 314 very helpful. The entire sentence reads:

> Notwithstanding the date in section 6(c) of the NFMA (16 U.S.C. 1600), the Forest Service, and the Bureau of Land Management under separate authority, may continue the management of lands within their jurisdiction under existing land and resource management plans pending completion of new plans.

This sentence, when read in its entirety, does not seem to be part of section 314's jurisdictional bar, but more likely was intended to excuse the Forest Service and BLM from failure to complete their new plans on schedule. Section 6(c) of the NFMA, 16 U.S.C. § 1604(c), requires the Forest Service to complete its new plans by September 30, 1985. While the statute does not cite any deadline that similarly constrains BLM, BLM did decide in 1986 that it would replace the current western Oregon plans in 1990. Were a plan to become invalid or subject to challenge "on its face" if it becomes "outdated"—in the same manner as an expired driver's license

or passport—no timber sales or other actions could be tiered to the plan EIS, and the management scheme would collapse in chaos. We cannot say whether, in the absence of section 314, the Forest Service plans would have become void after September 31, 1985.[3] Assuming that Congress intended, in a continuing budget resolution, to declare that the plans had not expired or become "outdated," language addressing the timing of transition to new plans does not help determine whether these plaintiffs, in this case, are challenging the plans or "particular activities."

■ We agree, however, with the district court and the government that the 1988 legislative history gives some support to the BLM interpretation of section 314 as barring this claim. The conference committee report provides that section 314 "is not intended to preclude case-by-case timber sale appeals in site-specific instances." H.R. Conf.Rep. 862, 100th Cong., 2d Sess. 76 (1988). The Senate Report explains further, however, that a challenge to a particular sale may be barred if it is in effect an indirect challenge to a plan.

> Legal challenges to particular activities, such as individual timber sales, are specifically exempted from this prohibition against legal challenges to existing plans so long as the challenge to the particular activity is not in effect an indirect challenge to an existing plan.

S.Rep. No. 100–410, 100th Cong., 2d Sess. 122–123 (1988). These committee reports suggest that, in the context of decisions about timber harvesting, the "particular activities" language in section 314 refers to individual timber sales and protest procedures available under 43 C.F.R. § 5000 et seq.[4] Because the environmental assess-

---

**3.** This case does not challenge Forest Service resource plans or timber sales, and we do not reach the question of section 314's effect on the Forest Service. The language and history of section 314 is not identical for the BLM and the Forest Service.

**4.** We reject plaintiffs' argument that *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), prevents us from considering legislative history accompanying the 1988 reenactment, without change, of section 314.

*Underwood* considered the meaning of the term "substantially justified" in the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d). The EAJA was reenacted, without change, in 1985. The House committee report suggested a meaning of "substantially justified" which contradicted "the almost uniform appellate interpretation" prior to the reenactment. The Court relied upon the rule that a reenactment without change "generally includes the settled judicial interpretation." 108 S.Ct. at 2551 (citation omitted). The Court remarked that, "[q]uite obvi-

ments that accompany individual timber sales are tiered to the EISs for the larger plans, so long as the EIS for the plan adequately addresses cumulative environmental impacts, any challenge to an individual sale will be limited to site-specific concerns.[5] Plaintiffs' NEPA claim is not such a challenge.

We need not consider in this litigation which "particular activities" other than those related to timber sales remain open to challenge, as plaintiffs do not challenge any non-timber-related activities. We also need not consider whether section 314 would bar a challenge that raises cumulative concerns in the context of an individual sale. That issue is raised with regard to Forest Service timber sales in another case currently pending before us, *Oregon Natural Resources Council v. Mohla*, No. 89–35350.

As we remarked in *PAS I:*

> The defendants argue that because the plaintiffs seek to enjoin every planned sale that includes old-growth timber within a 2.1–mile radius of an owl habitat, the attack is essentially an attack on the whole plan. It does have that effect. The plaintiffs argue, however, that the challenge of a number of particular sales is a challenge of "particular activities."

866 F.2d at 306. Similar arguments are made here. On this appeal plaintiffs claim support from the fact that they challenge less than 30 percent of planned timber sales; a challenge to 30 percent of one kind of "particular activity" authorized by the plans is not a challenge to the underlying plans, say plaintiffs. Looking at the same facts, the government argues that the relief demanded by plaintiffs is so broad that it would effectively vacate the BLM plans. The government points out that the injunctions plaintiff seeks would make it impossi-

ble for BLM to approach, much less meet, its annual allowable harvests under the plans. In attempting to define the statutory meaning by looking only at the relief this lawsuit demands, however, both plaintiffs and BLM go astray.

The answer to this quandary lies not in the scope of relief sought by plaintiffs, but in the underlying nature of plaintiffs' grievance. Plaintiffs challenge BLM's decision not to prepare a supplemental EIS in 1987. This was, they argue, a violation of NEPA. "NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA ... [focuses] government and public attention on the environmental effects of proposed agency action. 42 U.S.C. § 4321." *Marsh v. Oregon Natural Resources Council,* — U.S. —, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989). NEPA "insure[s] that ... environmental amenities and values may be given appropriate consideration in decisionmaking" by requiring that an EIS be prepared in every "recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332. Plaintiffs' challenge does not make sense unless it is connected to some underlying federal action or substantive decision.

Here, if plaintiffs were to succeed on the merits of their NEPA claim, BLM would be required to suspend its management plans and prepare a supplemental EIS, addressing concerns about the northern spotted owl. A supplemental EIS cannot be entirely divorced from some underlying substantive federal decision: a decision either to continue with the action that followed preparation of the original EIS or to modify that action. In this case, a supplemental EIS would consider the possible land use

ously, reenacting precisely the same language would be a strange way to make a change." *Id.* Further, in *Underwood* the House committee authoring the 1985 report did not draft the language in question, and the committee report urged adoption of an "unadministerable" standard, "out of accord with prior usage."

Here, the 1988 legislative history does not contradict any prior judicial interpretation, and

Congress did not reenact the same language in order to make a change.

5. A recent decision from the District of Oregon involving a challenge to an individual sale describes the "tiering" process. See *Headwaters, Inc. v. Bureau of Land Management,* Civil No. 89–6016, (amended opinion and order, May 23, 1989).

alternatives of designating more or less old-growth forest for "intensive timber management" or reserving it for spotted owl habitat. A supplemental EIS would, plaintiffs hope, result in a BLM decision to modify its land use decisions. Those land use decisions, however, were made in the TMPs. The TMPs designate certain land for "intensive timber management." The decision to designate old-growth forest for "intensive timber management" was made with the knowledge that owl habitat would be sacrificed in the clear cuts and conversion to second-growth forest. That intentional trade-off of owls for economic gain was precisely the land use decision which is being challenged by plaintiffs.

We hold that section 314 precludes this kind of claim.

There is a presumption in favor of judicial review of administrative actions. *See Block v. Community Nutrition Inst.*, 467 U.S. 340, 350–51, 104 S.Ct. 2450, 2456–57, 81 L.Ed.2d 270 (1984). It was that presumption which, in *PAS I*, required us to remand in order for the district court to apply the specific language of section 314 to plaintiffs' claims, to determine if, in fact, plaintiffs' claims rely solely on "new information" and whether they challenge the plans or "particular activities." The presumption in favor of review is overcome, however, where there is "persuasive reason to believe" that Congress intended to preclude judicial review, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), or a clear statutory command, *Moapa Band of Paiute Indians v. Dep't. of Interior*, 747 F.2d 563, 565 (9th Cir.1984). Here, there exists not only persuasive evidence of congressional intent, but an explicit statutory command precluding review.

Plaintiffs have had ample opportunity to put forward an alternative interpretation of section 314 which would give meaning to the prohibition on challenges to the BLM plans. They present arguments, addressed above, explaining that the NEPA claim does not challenge the plans. They do not, however, provide any satisfactory explanation of what exactly would be a challenge

to the plans under their interpretation of section 314. They present us no alternative interpretation that would allow us to give meaning to Congress' enactment, as is our duty, and yet would allow their NEPA claim to survive section 314. The district court correctly held that section 314 bars the NEPA claim.

*Non–NEPA Claims*

Plaintiffs also claim violations of the Oregon & California Lands Act, 43 U.S.C. § 1181, the Federal Lands Policy and Management Act, 43 U.S.C. §§ 1701 et seq., and the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 et seq. The district court granted summary judgment to BLM on each of these claims. These claims did not challenge the 1987 BLM decision not to prepare a supplemental EIS addressing the spotted owl. Instead, plaintiffs' complaint charges that BLM violated the OCLA and FLPMA by adopting a Forest Resources Policy Statement (FRPS) in 1983 requiring that all lands suitable for timber production be managed for the maximum timber production legally possible, and that destruction of old growth forest on BLM lands kills spotted owls, constituting a "taking" in violation of the MBTA.

In *PAS I*, we found that even if these claims could be construed as challenges to the plans, "fairly construed, the complaint does not rely solely on new information." 866 F.2d at 306. The OCLA and FLPMA claims challenge a BLM policy adopted prior to completion of many of the TMPs. The MBTA claim challenges the destruction of owl habitat planned in the TMPs. Indeed, as discussed in BLM's 1987 Spotted Owl Environmental Assessment, each TMP makes a region-wide decision, analyzed in the EIS, to trade owls for timber. The predicted destruction of owl habitat and resulting owl deaths are not new information. It was precisely this reasoning which allowed BLM to conclude that no supplemental EIS would be required.

The district court held that "the APA does not provide a basis for a challenge by [plaintiffs] to administrative decisions made over five years ago and upon which the BLM has operated without objec-

tion.... [Plaintiffs] failed to pursue [their] claims under OCLA, FLPMA, and the MBTA in a timely manner." *Portland Audubon Society v. Lujan,* 712 F.Supp. at 1484.

We have repeatedly cautioned against application of the equitable doctrine of laches to public interest environmental litigation.

> Laches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress' environmental policy. Furthermore, citizens have a right to assume that federal officials will comply with applicable law and to rely on that assumption.

*Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 854 (9th Cir.1982) (citations omitted). This approach has found unanimous support in the other circuits.[6] The district court failed to confront these precedents, and the government fails to distinguish them. All of the concerns expressed in *Preservation Coalition* are present here. The old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce. The forests will be enjoyed not principally by plaintiffs and their members but by many generations of the public, as well as by owls.

■ When the district court has invoked laches, a reviewing court must determine whether the district court properly found (a) lack of diligence by the party against whom the defense is asserted, and (b) prejudice to the party asserting the defense. *Preservation Coalition,* 667 F.2d at 854; *Coalition for Canyon Preservation v. Bowers,* 632 F.2d 774, 779 (9th Cir.1980). Here, the district court did not make a specific finding of prejudice or provide any explanation of how it considered

the government to have been prejudiced. Other than noting that plaintiffs had not brought court challenges under the OCLA, FLPMA and MBTA until 1987, the district court did not indicate that plaintiffs had shown a lack of diligence.

The government argues that plaintiffs' claims should have been presented earlier, during the planning process that resulted in the TMPs. Plaintiffs respond that while the legal basis for their non-NEPA claims may have been available sooner, the motivation for this litigation came from the later revelation that the northern spotted owl may be endangered. Soon after receiving predictions of the owl's eventual demise in 1985 and 1986, they asked BLM to reexamine its planned destruction of owl habitat. Following BLM's refusal to prepare a supplemental EIS, they filed an administrative challenge, raising the same non-NEPA claims they now pursue.

■ An "indispensable element of lack of diligence is knowledge, or reason to know, of the legal right, assertion of which is 'delayed'." *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir.1975). As plaintiffs argue, the first case of which we are aware that acknowledges the right of citizens to enforce the MBTA through the Administrative Procedure Act was decided in 1987. *Alaska Fish & Wildlife Fed'n v. Dunkle,* 829 F.2d 933, 938 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988). Plaintiffs cannot be said to have lacked diligence in not pursuing the MBTA claim earlier.

Even if plaintiffs had lacked diligence, however, the government has not demonstrated that it will suffer any prejudice if a court hears the merits of plaintiffs' non-NEPA claims. This is not a case where a dam or nuclear power plant has already been built, where a plaintiff has "sandbagged" a defendant by bringing a late challenge.

**6.** *Park County Resources Council v. United States Dep't of Agric.,* 817 F.2d 609, 617 (10th Cir.1987); *Concerned Citizens on I-190 v. Secretary of Transp.,* 641 F.2d 1, 7–8 (1st Cir.1981); *Save Our Wetlands, Inc. v. United States Army Corps of Eng'rs,* 549 F.2d 1021, 1026 (5th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *City of Rochester v. United States Postal Serv.,* 541 F.2d 967, 977 (2d Cir.1976); *Minnesota Pub. Int. Res. Group v. Butz,* 498 F.2d 1314, 1324 (8th Cir.1974); *Envtl. Defense Fund v. Tennessee Valley Auth.,* 468 F.2d 1164, 1182–83 (6th Cir.1972); *Arlington Coalition on Transp. v. Volpe,* 458 F.2d 1323, 1329–30 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972).

In this expedited appeal, we have not requested briefing on the merits of plaintiffs' non-NEPA claims. We express no opinion on the merits, on whether any other procedural defense may be available to defendants and intervenors, or whether these remaining claims would justify preliminary injunctive relief. We remand so that the district court can consider these matters in further proceedings.

We AFFIRM summary judgment in favor of the government on the NEPA claim and REVERSE and REMAND plaintiffs' non-NEPA claims. The injunction pending appeal is vacated on the date of the filing of this opinion.

No party to recover costs in this court.