21 F.3d 895
 24 Envtl. L. Rep. 20,854
 APACHE SURVIVAL COALITION, et al., Plaintiffs-Appellants,
v.
UNITED STATES of America, and James Abbott, in his official
capacity as Supervisor, Coronado National Forest,
Defendants-Appellees,
and
The University of Arizona, Defendant-Intervenor-Appellee.
APACHE SURVIVAL COALITION, et al., Plaintiffs-Appellants,
v.
UNITED STATES of America, and James Abbott, in his official
capacity as Supervisor, Coronado National Forest,
Defendants-Appellees,
and
The University of Arizona, Defendant-Intervenor-Appellee.
 Nos. 92-15635, 92-16288.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 31, 1993.
Decided April 8, 1994.
 
 Michael R. Lozeau, San Francisco, CA, for plaintiffs-appellants.
 M. Alice Thurston, U.S. Dept. of Justice, Washington, DC, for defendants-appellees U.S., et al.
 William N. Poorten, III, Snell & Wilmer, Tucson, AZ, for intervenor-appellee University of Arizona.
 Appeals from the United States District Court for the District of Arizona.
 Before: CHOY, D.W. NELSON, and NORRIS, Circuit Judges.
 Opinion by Judge D.W. NELSON
 D.W. NELSON, Circuit Judge:
 
 
 1
 This is the fourth time in three years that this court has considered challenges to the Mount Graham international astrophysical observatory project.[1] In this case, the Apache Survival Coalition ("Coalition"), a nonprofit corporation created under the laws of the State of Arizona in May 1990, seeks to halt construction of several telescopes on Mount Graham, Arizona, basing its challenge on constitutional and statutory grounds. Concluding that the Coalition's constitutional arguments are without merit and that its statutory claim is barred by laches, we affirm the judgment of the district court.
 
 Factual and Procedural Background
 
 2
 Much of the history concerning the dispute over the Mount Graham observatory project and the subsequent congressional intervention is set out in this court's prior opinion in Mt. Graham Red Squirrel v. Madigan (Red Squirrel II), 954 F.2d 1441, 1443-48 (9th Cir.1992). We recount only those events relevant to the Coalition's claims.
 
 
 3
 In 1984, an international consortium proposed the construction of an observatory complex on Mount Graham that would include "construction of the most sophisticated array of telescopes ever assembled." Red Squirrel II, 954 F.2d at 1444. In response to the proposal and pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. Sec. 4321 et seq. (1988), the Coronado National Forest Service ("Forest Service" or "Service") began to prepare an Environmental Impact Statement ("EIS"). In conjunction with its NEPA review, the Service also commenced a "Section 106 review process" pursuant to the National Historical Preservation Act ("NHPA"), 16 U.S.C. Sec. 470f (1988), to determine if any cultural resources existed on Mount Graham.[2] This included both a literature review and physical inventory of the area.
 
 
 4
 In 1985, the Forest Service located what it termed three "shrines"[3] on two of Mount Graham's summits: Hawk Peak and High Peak. The Service concluded that these sites qualified for the National Historical Register because of the shrines' potential religious significance to living American Indian tribes. The Forest Service recommended to the State Historical Preservation Officer ("SHPO") that efforts be taken to mitigate any adverse effect on the shrines during the construction of the telescopes, and it was contemplated that a mitigation plan would be developed in consultation with nearby Indian tribes and the University. In furtherance of this task, the University of Arizona ("University"), working with the Forest Service, contacted nineteen local tribes concerning the find, including the San Carlos Apache, but only two, the Ak-Chin and Hopi, responded. Subsequently, the SHPO determined that the planned telescopes would have no adverse affect on the shrines, but that additional surveys should be conducted on two of Mount Graham's other summits, Emerald Peak and Plainview Peak, to determine if there were cultural resources at those locations as well. Both were inspected in 1985 and no visible cultural resources were observed.
 
 
 5
 At the same time that the Forest Service conducted its NEPA and NHPA review, it also prepared a Forest Plan Draft Environmental Statement ("FEIS") pursuant to the National Forest Management Act ("NFMA"), 16 U.S.C. Sec. 1600 et seq. (1988). This document included details of the Service's NHPA review. In September 1985, attorneys for the San Carlos Apache requested a copy of the FEIS and met with the forest supervisor. In its October response the Tribe raised issues pertaining only to its property, mineral, and grazing rights. No religious objections were raised.
 
 
 6
 In December 1985, the University of Arizona provided the Forest Service with a report on the shrines. In addition to recommending mitigation measures, the report stated that a number of Indian tribes, including the San Carlos Apache, had been informed of the existence of the shrines and sent a copy of the report. Although the Apache did not respond, representatives of one of the other listed tribes, the Zuni tribe of New Mexico, requested permission to visit the site. On August 6, 1986, after extensive consultation with that tribe, the Forest Service determined that the telescopes would have no adverse impact on the cultural sites it had identified. The SHPO agreed, believing that excavations could mitigate any adverse effect; finally, the Advisory Council on Historical Preservation (AC) also concurred. Accordingly, the Forest Service published a Draft Environmental Impact Statement ("DEIS") in October 1986. Various interest groups, Indians tribes, and associations commented on the DEIS, and a copy was sent to the San Carlos Apache. Following the comment period, the Forest Service conducted further cultural surveys and prepared a status report responding to the various concerns raised. The preferred alternative identified in the report was to build five telescopes on High Peak. The SHPO and AC once again concurred in a finding of "no adverse impact," but on the condition that the shrines would be protected in their current location and would not be excavated. Subsequently, the University proposed the placement of one of the five telescopes on Emerald Peak.
 
 
 7
 Developments hit a snag in 1987 when, shortly after the Forest Service completed its Biological Assessment of its preferred alternative as required by section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. Sec. 1536 (1988), the red squirrel was discovered on Mount Graham. The Department of Fish and Wildlife put the squirrel on the endangered species list shortly thereafter. See generally Red Squirrel II, 954 F.2d at 1444-45. After initiation of formal consultations with the Forest Service, the Department "tentatively concluded that it would agree to development on High Peak, but not to any development on Emerald Peak." Id. at 1445. Finding this unacceptable, the University submitted its own proposal in late 1987. This new proposal called for construction of three telescopes on High Peak and four telescopes on Emerald Peak, which had been surveyed in July and again in October. For the purposes of NHPA, a revised determination of "no adverse effect" was prepared for High Peak, and a finding of no cultural resources for Emerald Peak. On the condition that the site on High Peak was adequately protected, the SHPO and AC concurred.
 
 
 8
 The Department issued a Biological Opinion in 1988. It provided three "reasonable and prudent alternatives" to the University's proposal. In contrast to the Department's earlier position that the construction of any telescopes on Emerald Peak was inappropriate, Reasonable and Prudent Alternative Three ("Alternative Three") provided for the construction of all seven telescopes on Emerald Peak. See Red Squirrel II, 954 F.2d at 1445-46. Although no cultural resources had been recovered during surveys in the Emerald Peak area, the Forest Service conducted further intensive ground surveys. Again, no cultural resources were located, clearance was recommended, and the SHPO concurred.
 
 
 9
 In May 1988, the Forest Service sent the San Carlos Apache and other tribes a card asking if they wished to receive a copy of the final EIS or to remain on the Forest Service's mailing list. Although the San Carlos Apache asked to be removed from the mailing list, the Forest Service kept the Tribe on it. A final EIS was issued in the fall of 1988; it stated that no further cultural resources had been discovered in the Mount Graham area since the original discoveries. A copy was sent to the San Carlos Apache.
 
 
 10
 At this juncture the University, fearing that further delay would imperil the project, took its case to Congress and lobbied for legislation authorizing immediate construction of the observatory. In late 1988, Congress enacted the Arizona-Idaho Conservation Act of 1988 ("AICA"), Pub.L. No. 100-696, 102 Stat. 4571. As described in Red Squirrel II, Congress "essentially assumed the role the Forest Service would ordinarily have played and made a selection among the three 'reasonable and prudent' alternatives, choosing Alternative Three." Red Squirrel II, 954 F.2d at 1446.
 
 
 11
 Title VI of the Act provides for the construction of seven telescopes on Emerald Peak only, but bifurcates the project into two distinct phases: the first concerns the construction of the first three telescopes, and the second deals with the remaining four. For the first phase, AICA provides that "[s]ubject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the requirements of the Endangered Species Act shall be deemed satisfied as to the issuance of a Special Use Authorization for the first three telescopes," AICA Sec. 602, and orders the Secretary immediately to approve construction of the telescopes and associated support facilities and access roads, see id. Section 607 of the Act similarly deems the requirements of NEPA to be met for the purposes of approving construction of the first three telescopes, and section 604 directs the Forest Service to develop and implement a plan consistent with Alternative Three. See id. Secs. 604, 607. With respect to the second phase, AICA provides that the remaining four telescopes and related facilities must be authorized and constructed in accordance with all applicable law. See id. Sec. 603.
 
 
 12
 The Administrative Record closed in late 1988 and, in January 1989, the Forest Service published the Record of Decision. The special use permit contemplated by AICA was issued on April 7, 1989. In late August 1990, two years after the administrative record had closed, the San Carlos Apache Tribal Chairman wrote to the Forest Service, informing the Service of the religious importance of Mount Graham to the Tribe.[4] The letter denied receipt of any prior correspondence and asked the Forest Service to halt construction immediately. The Regional Forester responded and requested information concerning specific sites that were of interest to the Tribe. No response was forthcoming. The Regional Forester received another letter from the Tribal Council in June 1991, which again demanded cessation of construction of the three telescopes. The Forest Service responded and requested a meeting to discuss the Tribe's concerns. Again, the Tribe failed to respond; instead, it turned to the courts.
 
 
 13
 On August 19, 1991 the Coalition filed a complaint against the United States and the Supervisor of the Coronado National Forest in the United States District Court for the District of Arizona seeking injunctive and declaratory relief. The complaint asserted four causes of action, which included allegations that the special use permit issued in April 1989 was invalid because Title VI of AICA violates the constitutional doctrine of separation of powers and because the Forest Service had failed to comply with NHPA.[5]
 
 
 14
 In February 1992, the Coalition moved for partial summary judgment on the issue of AICA's constitutionality, and the United States filed a cross-motion for summary judgment on the entire case. Subsequently, on April 1, 1992, the Coalition moved for a preliminary injunction to halt further construction of the observatory pending the outcome of the dispute, and the University was permitted to intervene. On April 10, the district court denied the request for the injunction, and, in a separate proceeding in May, granted summary judgment for the United States. Separate appeals were taken, which were consolidated for this action.[6] We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 Analysis
 
 15
 In this appeal, the Coalition advances two distinct theories for why the special use permit issued under AICA is invalid, and therefore, that construction of the telescopes must be halted. First, the Coalition asserts that AICA itself violates separation of powers principles, and, consequently, that the special use permit lacks statutory authority. Second, and independently, the Coalition maintains that the Forest Service's failure to comply with NHPA resulted in issuance of the permit without the agency properly having "taken into account" the impact that construction of the observatory would have on the San Carlos Apache's religious practices and heritage as required by section 106 of that Act. We address each argument in turn.
 
 I. The Constitutionality of AICA
 
 16
 The Coalition alleges that AICA violates separation of powers principles in two distinct but related ways. First, relying on United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871) and this court's decision in Seattle Audubon Soc'y v. Robertson, 914 F.2d 1311 (9th Cir.1990), rev'd on other grounds, --- U.S. ----, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992), the Coalition contends that AICA infringes on the Judicial Branch's powers by "prescrib[ing] a rule of decision of a cause in a particular way, without changing the underlying laws," Seattle Audubon, 914 F.2d at 1317. Second, the Coalition asserts that AICA infringes on the powers of the Executive Branch by impermissibly truncating preexisting delegations of power to federal agencies under NEPA and ESA without altering the delegations themselves. We review the constitutionality of a statute de novo. See, e.g., Gray v. First Winthrop Corp., 989 F.2d 1564, 1567 (9th Cir.1993). We find both of these arguments meritless.
 
 A.
 
 17
 We believe that the Coalition's Klein argument is flawed in its initial premise: that there has been no change in the underlying law.
 
 
 18
 This case is controlled by Robertson v. Seattle Audubon Soc'y, --- U.S. ----, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). There, the Court was faced with an almost identical question with respect to Sec. 318 of the Department of the Interior and Related Agencies Appropriations Act (the "Northwest Timber Compromise"), Pub.L. No. 101-121, 103 Stat. 701, 747 (1990). The relevant statutory language provided that:
 
 
 19
 Without passing on the legal and factual adequacy of the Final Supplement to the Environmental Impact Statement ... the Congress hereby determines and directs that management of areas according to subsections b(3) and b(5) of this section ... is adequate consideration for the purposes of meeting the statutory requirements that are the basis for the consolidated cases captioned Seattle Audubon Society et al., v. F. Dale Robertson ... and Washington Contract Loggers Assoc. et al., v. F. Dale Robertson, ... and the case Portland Audubon Society et al., v. Manuel Lujan, Jr.....
 
 
 20
 Northwest Timber Compromise Sec. 318(b)(6)(A).
 
 
 21
 The Court phrased the decisive question as whether this language "replaced the [original] legal standard ... without directing particular applications under either the old or the new standards." Robertson, --- U.S. at ----, 112 S.Ct. at 1413. The Court ruled that it did. First, it found that the statute's reference to a pending case instead of the underlying statutory schemes in dispute was of no moment; such a reference was adequate to implicate the five statutes that "formed 'the basis for' the original lawsuits." Id. at ----, 112 S.Ct. at 1413; cf. Atonio v. Wards Cove Packing Co., Inc., 10 F.3d 1485, 1493 (9th Cir.1993) (noting that in Robertson "[e]ven explicit reference to pending cases ... failed to present a separation of powers problem"). Second, the court determined that the new standards contained in subsections b(3) and b(5) modified the standards that ordinarily would have applied. See Robertson, --- U.S. at ----, 112 S.Ct. at 1413-14. Third, and crucially, the Court held that the substitution of the new standards did not imply an instruction to the courts to apply them in any particular way. The language that Congress "determine[d] and directe[d]" that the requirements of the specific statutory provisions would be satisfied by application of the new standard instead constituted "a change in the law, not specific results under old law." Id. at ----, 112 S.Ct. at 1414; see also Gray, 989 F.2d at 1569 (so interpreting Robertson ). Finally, the Court "fail[ed] to appreciate the significance" of the fact that Congress chose to modify the old law by deeming its requirements satisfied by a new standard. Congress can modify a statute directly or indirectly; the form is not decisive. See Robertson, --- U.S. at ----, 112 S.Ct. at 1414.
 
 
 22
 In this case, the relevant language provides:
 
 
 23
 Subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the requirements of section 7 of the Endangered Species Act shall be deemed satisfied as to the issuance of a Special Use Authorization for the first three telescopes and the Secretary Shall immediately approve the construction of the following items:
 
 
 24
 (1) three telescopes to be located on Emerald Peak;
 
 
 25
 (2) necessary support facilities; and
 
 
 26
 (3) an access road to the Site.
 
 
 27
 AICA Sec. 602(a) (emphasis added). AICA also provides that:
 
 
 28
 With reference to the construction of the first three telescopes, related facilities, and the access road within the boundaries of the Site described in section 601, the requirements of section 102(2)(c) of the National Environmental Policy Act of 1969 shall be deemed to have been satisfied. The Environmental Impact Statement for the Site, currently in process, shall continue and shall use the information developed to date and any additional appropriate information in analyzing the impacts of the four additional telescopes authorized under section 603 of this title.
 
 
 29
 Id. Sec. 607 (emphasis added).
 
 
 30
 AICA, it appears, had two effects. First, it expressly suspended the requirements of NEPA with respect to the construction of the first three telescopes. Second, it implicitly suspended the requirements of the ESA and replaced them with the requirements of Reasonable and Prudent Alternative Three. Thus, like in Robertson, the statute substituted preexisting legal standards that governed a particular project, in this case ESA and NEPA, with the new standards, in this case Reasonable and Prudent Alternative Three. Moreover, nothing in the statute directs a court to apply the requirements set forth in Alternative Three in any specific manner. Thus, like Robertson, AICA mandates "a change in law, not specific results under old law." Robertson, --- U.S. at ----, 112 S.Ct. at 1414.
 
 
 31
 The Coalition responds that Robertson is distinguishable. The Coalition asserts that a repeal of NEPA and ESA can be found only by implication; pointing to language that was proposed for AICA by the University that would have suspended the application of all applicable law to the observatory project,[7] the Coalition further reasons that Congress's rejection of this proposal requires the conclusion that no repeals by implication can be found. This is buttressed, the Coalition claims, by the canon of construction that " 'repeals by implication are not favored.' " E.g., Morton v. Mancari, 417 U.S. 535, 549-50, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (quoting Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)).
 
 
 32
 This contention is contradicted by our prior decision in Red Squirrel II. Undertaking an exhaustive analysis of the statutory text, structure, purpose, and legislative history, we concluded that AICA waived the requires of both NEPA and ESA with respect to the construction of the first three telescopes:
 
 
 33
 Viewed as a whole, the statute clearly differentiates between its treatment of the first three telescopes and the next four. Construction of the first three is plainly exempted from other important environmental requirements, specifically [NEPA]. Although the statute does not waive the provisions of section 7 of [ESA] for the entire first phase of the project as clearly as it waives the provisions of NEPA, the legislators who spoke ... in support of the legislation made no distinction between the two waivers.... Because anything short of such a provision would not have provided the necessary assurance that further environmental delay would not bring a project to a halt, the conclusion that Congress intended to waive the section 7 provisions regarding the first three telescopes seems more consistent with the statutory objectives than the alternatives....
 
 
 34
 Red Squirrel II, 954 F.2d at 1457-58 (emphasis added). Although we noted that the language used to repeal ESA was ambiguous, we did not find this determinative. Rather, ambiguity in the language used by Congress was "simply [one] factor [to be] weigh[ed] in the balance." Id. at 1453.
 
 
 35
 Furthermore, nothing in Robertson precludes finding an implied repeal if otherwise appropriate, for Robertson itself involved a repeal by implication. The statute in that case provided that the requirements of two new subsections were deemed sufficient "for meeting the statutory requirements" of several pending cases. Northwest Timber Compromise Sec. 318(b)(6)(a). Because five distinct statutory schemes "formed 'the basis for' the original lawsuits," all five were found repealed in the relevant respect. Robertson, --- U.S. at ----, 112 S.Ct. at 1413.[8]
 
 
 36
 The Coalition responds that the implied repeal found in Robertson is inapposite because Robertson cited Simpson v. United States, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), for the proposition that a repeal may be found when "specific provisions qualify general ones," Robertson, --- U.S. at ----, 112 S.Ct. at 1414 (citing Simpson, 435 U.S. at 15, 98 S.Ct. at 914). The canon drawn from Simpson cannot be relied upon in this case, the Coalition contends, because in that case the Court determined that the repealing and the impliedly repealed statutes shared a common concern. In this case, the Coalition argues, the same cannot be said of AICA, ESA, and NEPA.
 
 
 37
 We find it unnecessary to address this argument because the canon of construction that the court cited Simpson to stand for was neither necessary to the decision in Robertson nor to the resolution of the similar question posed in this case. Although the Robertson Court noted that repeals by implication are disfavored, it also invoked the maxim that "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act." NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937) (quoted in Robertson, --- U.S. at ----, 112 S.Ct. at 1414). The same principle applies here. Between a construction of AICA that renders it constitutional and one that creates substantial constitutional doubt, we are required to take the path that results in clear constitutionality. See Edward J. DeBartolo Corp. v. Florida Gulf Coast Build. & Const. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems...."); Communication Workers of Am. v. Beck, 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988) (same); Gray, 989 F.2d at 1568 (quoting Communication Workers); see also Blitz v. Donovan, 740 F.2d 1241, 1244 (D.C.Cir.1984) (" 'When a statute is fairly subject to a variety of interpretations all but one of which would make it unconstitutional, then the courts must presume Congress intended the interpretation which is constitutionally permissible.' " (quoting United States v. Thompson, 452 F.2d 1333, 1337 (D.C.Cir.1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972))).
 
 
 38
 Of course, a saving construction must be a permissible one. If the "inevitable effect of a statute on its face" is contrary to the constitution, a saving construction only arrogates Congress's power. United States v. O'Brien, 391 U.S. 367, 384-85, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 (1968). Likewise, a statute may be construed to avoid a serious constitutional problem only if "such construction is plainly [not] contrary to the intent of Congress." Edward J. DeBartolo Corp., 485 U.S. at 575, 108 S.Ct. at 1397; accord Communication Workers, 487 U.S. at 762, 108 S.Ct. at 2657. But here, just as in Robertson, the new statute "provided by its terms that compliance with certain new law constituted compliance with certain old law." Robertson, --- U.S. at ----, 112 S.Ct. at 1414 (emphasis in original).[9] In such circumstances, where meeting the requirements of "certain new law constitutes compliance with certain old law, the intent to modify [is] not only clear, but express." Id. at ----, 112 S.Ct. at 1414 (emphasis added).[10]
 
 
 39
 Because we believe that AICA "compel[s] changes in law, not findings or results under old law," id. at ----, 112 S.Ct. at 1413, we have "no occasion to address any broad question of Article III jurisprudence," id. at ----, 112 S.Ct. at 1414. When the statute changes the underlying law in a manner that is not independently unconstitutional, the rule of Klein as interpreted by our circuit is inapplicable. See Gray, 989 F.2d at 1568-69; Seattle Audubon, 914 F.2d at 1315-17.
 
 B.
 
 40
 In light of our conclusion that AICA changed the underlying law, we reject the Coalition's argument that Congress somehow has arrogated the powers reserved to the Executive Branch. AICA does not usurp the Forest Service's authority to decide if the requirements of ESA or NEPA have been met; rather, it exempts the Project from those requirements and substitutes new ones. "It is fully within Congress's prerogative legislatively to alter the reach of the laws it passes, assuming no constitutional principles are thereby violated." Stop H-3 Ass'n v. Dole, 870 F.2d 1419, 1437 (9th Cir.1989).
 
 
 41
 The Coalition believes it has found such a "constitutional principle" in INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), which it cites for the proposition that "Congress must abide by its delegation of authority until the delegation is legislatively altered or revoked," id. at 955, 103 S.Ct. at 2786. That the underlying law has been altered is our very point. Chadha does not condemn the result, only the method, in that case the one-house legislative veto. See id. at 956, 103 S.Ct. at 2787. Here, as in Robertson, the method chosen was a permissible one. See, e.g., Bowsher v. Synar, 478 U.S. 714, 733-34, 106 S.Ct. 3181, 3191-92, 92 L.Ed.2d 583 (1986) ("[O]nce Congress makes its choice in enacting legislation its participation ends. Congress can thereafter control the execution of its enactments only indirectly--by passing new legislation." (citing Chadha, 462 U.S. at 958, 103 S.Ct. at 2787)). With respect to the new legal standard, AICA fully left intact the Forest Service's power to ensure that the project conformed with the new requirements, those of Alternative Three. See Mount Graham Red Squirrel v. Espy (Red Squirrel III), 986 F.2d 1568, 1573-75 (9th Cir.1993). There has been no usurpation of the Executive's power; instead, Congress has changed the scope of the Executive's duties.
 
 
 42
 II. The Coalition's NHPA Claim is Barred by Laches
 
 
 43
 The Coalition argues that, even if AICA is constitutional, the special use permit is invalid because the Forest Service failed to fulfill its obligations under NHPA. The government and the University respond that AICA renders NHPA inapplicable to the Mount Graham project. As an alternative, they contend that NHPA's requirements have been satisfied. Finally, Respondents maintain that the district court was correct to find the Coalition's NHPA claim barred by laches. Because we conclude that the Coalition's challenge is barred by laches, we do not reach the questions of whether NHPA applies, and if it does, whether there has been compliance.
 
 A. The Appropriate Laches Standard
 
 44
 The district court appeared to bar the Coalition's NHPA claim on the basis of laches.[11] The Coalition does not dispute that laches, if otherwise appropriate, would provide a proper basis for affirming the decision of the district court;[12] rather, it contends that the laches standard invoked in cases brought under NEPA, a standard that acknowledges the special concerns of suits brought to vindicate the public interest, should apply. In addition, the Coalition argues that, under the appropriate standard, laches cannot be established. While we hold that the district court applied the incorrect laches standard, we ultimately conclude that laches nonetheless bars the Coalition's claim.
 
 1.
 
 45
 Although the application of laches depends on the facts of the particular case and is consigned as an initial matter to the sound discretion of the district court judge, that discretion must be exercised within limits. See, e.g., Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 779 (9th Cir.1980). To demonstrate laches, a party must establish " '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.' " Lathan v. Brinegar, 506 F.2d 677, 692 (9th Cir.1974) (en banc) (quoting Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961) (emphasis added)); accord Daingerfield Island Protective Soc'y v. Lujan, 920 F.2d 32, 37 (D.C.Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); Portland Audubon Soc'y v. Lujan, 884 F.2d 1233, 1241 (9th Cir.1989).
 
 
 46
 In environmental cases, such as those brought under NEPA, however, it is recognized universally that these criteria must be applied in light of the principle that "[l]aches must be invoked sparingly" in suits brought to vindicate the public interest. Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 854 (9th Cir.1982); accord Daingerfield Island, 920 F.2d at 37; see also Portland Audubon Soc'y, 884 F.2d at 1241 (citing the numerous circuits that have adopted this principle). Two reasons generally are given for this policy. First, it is said that "citizens have a right to assume that federal officials will comply with applicable law." Preservation Coalition, 667 F.2d at 854; see also Cady v. Morton, 527 F.2d 786, 793 (9th Cir.1975) (expressing concern with creating incentives for agency noncompliance (quoting Minnesota PIRG v. Butz, 498 F.2d 1314, 1324 (8th Cir.1974))); City of Davis v. Coleman, 521 F.2d 661, 678 (9th Cir.1975) ("It is up to the agency, not the public, to ensure compliance with NEPA in the first instance."). Second, because "ordinarily the plaintiff will not be the only victim of alleged environmental damage," "[a] less grudging application of the doctrine might defeat Congress' environmental policy." Portland Audubon Soc'y, 884 F.2d at 1241 (quoting Preservation Coalition, 667 F.2d at 854).
 
 2.
 
 47
 We agree with the Coalition that the laches standard used in NEPA cases should apply to its NHPA claim and that the district court erred in failing to rely upon this standard. Although the obligations imposed by NHPA are "separate and independent from those mandated by NEPA," National Indian Youth Council v. Andrus, 501 F.Supp. 649, 674 (D.N.M.1980), aff'd, 664 F.2d 220 (10th Cir.1981), the two statutory schemes are closely related. Both are "stop, look, and listen" provisions, Illinois Commerce Comm'n v. ICC, 848 F.2d 1246, 1261 (D.C.Cir.1988) (internal quotations omitted), cert. denied, 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989), that are "design[ed] to ensure that Federal agencies take into account the effect of Federal or Federally-assisted programs." Morris County Trust for Historic Preservation v. Pierce, 714 F.2d 271, 278-79 (3d Cir.1983). Both statutes, therefore, require agencies to consider how particular projects might affect the public interest. See United States v. 0.95 Acres of Land, 994 F.2d 696, 698 (9th Cir.1993) ("NHPA is similar to NEPA except that it requires consideration of historic sites, rather than the environment."). Moreover, as Appellees point out, NHPA's implementing regulations contemplate that NEPA and NHPA review should be integrated closely. See Sierra Club v. Clark, 774 F.2d 1406, 1410 (9th Cir.1985); 36 C.F.R. Sec. 800.14(a) (1993). Thus, just as courts have found that the same lenient standard for granting a preliminary injunction that is applied to NEPA claims should also be applied to challenges brought under NHPA, see, e.g., Colorado River Indian Tribes v. Marsh, 605 F.Supp. 1425, 1440 & n. 11 (C.D.Cal.1985), we conclude that the same laches standard should apply to challenges brought under both statutes.[13]
 
 3.
 
 48
 Nowhere in its memorandum denying the Coalition's request for a preliminary injunction did the district court acknowledge the special concerns implicated by suits brought to vindicate the public interest. Because the district court applied the incorrect legal standard, it abused its discretion. See Park County Resource Council, Inc. v. United States Dep't of Agriculture, 817 F.2d 609, 617 (10th Cir.1987) ("In environmental litigation one measure of abuse of discretion is whether the district court recognized that laches must be invoked sparingly in order to facilitate Congress's environmental policy."); accord Daingerfield Island, 920 F.2d at 38.
 
 
 49
 When the district court has misapprehended the law in assessing a laches defense, we often have remanded for application of the correct standard, particularly if further factual development is necessary. See, e.g., Espino v. Ocean Cargo Line, Ltd., 382 F.2d 67, 70 (9th Cir.1967); cf. Lathan, 506 F.2d at 692 ("[W]hether laches bars an action in a particular case depends upon the facts and circumstances of that case and is a questions addressed primarily to the discretion of the trial court."). However, in the context of challenges brought under environmental statutes, frequently we have resolved the issue on appeal. See, e.g., Portland Audubon Soc'y, 884 F.2d at 1241-42 (deciding the laches issue on appeal from the grant of summary judgment when the district court failed to recognize the special laches standard applicable in environmental cases); Preservation Coalition, 667 F.2d at 854-55; Coalition for Canyon Preservation, 632 F.2d at 779-80. We similarly resolve the laches issue in this case because the factual record is sufficiently developed and to do so furthers judicial economy by obviating the need to reach the merits. Cf. Park County, 817 F.2d at 618 ("Although failure to apply the correct legal standard could be the basis for remand to the district court, we have found that remand is not necessary where there is no dispute regarding the underlying facts and where it is in the interest of judicial economy and efficiency to decide a matter." (citing Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 923 n. 2 (10th Cir.1986))).
 
 B. Laches Analysis
 
 50
 Applying the correct legal standard, we believe that recourse to laches is justified to bar the Coalition's NHPA claim. First, we conclude that the Coalition brought its NHPA claim with inexcusable delay. Second, we conclude that permitting the Coalition's claim to proceed would result in undue prejudice to the respondents.
 
 1. Inexcusable Delay
 
 51
 (a)
 
 
 52
 As an initial matter, we hold that, for the purposes of laches analysis, the Tribe and the Coalition should be treated as a single entity. It is clear that the Coalition represents the interests of the Tribe and its members. This is evident both from the fact that the Coalition is composed of members of the San Carlos Apache Tribe--including members of the governing Tribal Council--and from the Coalition's stated purpose of "protect[ing] and preserv[ing] traditional Apache Culture." Complaint pp 10, 12. Moreover, the primary arguments advanced by the Coalition in this court focus on how the Forest Service's implementation of NHPA ignored the interests of the San Carlos Apache as a tribe. See Appellants' Opening Brief at 6, 36-41. Finally, we believe that to hold otherwise would permit an entity, such as the Tribe in this case, to avoid taking responsibility for its conduct by the simple expedient of suing in a different capacity. Cf. 18 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Sec. 4456, at 491 (1981) [hereinafter Wright & Miller] (noting in the res judicata context that "i[t] seems clear enough that [an] association should not be able to evade preclusion continually by averring that unidentified members are not bound and bringing successive suits by claiming injury to different identified members").
 
 
 53
 (b)
 
 
 54
 Identifying the Coalition with the Tribe, we believe that the Coalition and its members asserted their rights in this action with inexcusable tardiness. As discussed above, the San Carlos Apache were solicited for input concerning Mount Graham and its cultural resources starting in 1985. The Tribe's only response was to seek assurances that its property rights would be protected. In 1986, the Tribe failed to respond to the Forest Service's request for comments on the DEIS, and in 1988, the Tribe asked to have its name taken off the mailing list for the final EIS. Nonetheless, a final EIS was provided; the Tribe, however, failed to provide comment or input.
 
 
 55
 It is clear, then, that the Tribe ignored the very process that its members now contend was inadequate. In these circumstances, we believe that laches should not be measured not from the date of the relevant agency action, in this case issuance of the Special Use Permit, but from the onset of the NHPA review process, beginning with the Forest Service's first attempts to elicit the Tribe's input in 1985.[14] Although rarely articulated in the cases, the primary rationale for finding laches to run from the date of the relevant agency action is that "[u]ntil that date plaintiff might have presumed that the Secretary would not approve the project" without first ensuring compliance with the appropriate regulatory procedures. Clarke v. Volpe, 342 F.Supp. 1324, 1329 (E.D.La.), aff'd, 461 F.2d 1266 (5th Cir.1972); see also Hall County Historical Soc'y, Inc. v. Georgia Dep't of Transp., 447 F.Supp. 741, 748 (N.D.Ga.1978). Here, however, the agency was attempting to follow the applicable procedures by notifying and seeking input from all possibly interested parties. While the process moved forward, the members of the Tribe remained virtually silent.
 
 
 56
 Although it is true that the Tribe's awareness that the Forest Service was conducting NHPA review could not inform the Tribe of each of the specific defects that it now alleges infected that process, "the Tribe would have acquired this knowledge had it exercised the proper diligence." Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324, 1329 (10th Cir.1982) ("Laches does not depend on the subjective awareness of the legal basis on which a claim can be made"). For instance, comments from the Tribe could have corrected the deficiencies that the Coalition now identifies in the Forest Service's literature review. Moreover, if the Tribe had chosen, like the Zuni, actively to become part of the NHPA process, it could have ensured that the surveys of Emerald Peak that it now contends are inadequate were made in a manner that satisfied their concerns. Finally, and most importantly, the Coalition's primary contention, that the Forest Service has failed completely to consider the religious significance of Mount Graham as a whole to the Tribe, see infra pp. 912-13, could have been remedied had the Tribe not removed itself from the NHPA process. In these circumstances, the Tribe is not entitled to the benefit of the presumption that agency officials will comply with the law. Cf. Hall County, 447 F.Supp. at 748 ("Once the unique historic character of the District ... w[as] brought to the attention of the defendants, plaintiff became entitled to presume that the defendants would comply with the law." (citing Steubing v. Brinegar, 511 F.2d 489 (2d Cir.1975)) (emphasis added)).
 
 
 57
 A second rationale for measuring laches from the relevant agency action is that parties other than the one that happened to file suit might suffer the asserted harm. Cf. Preservation Coalition, 667 F.2d at 354. However, this rationale also is inapplicable in this case. There is no reason to believe that other parties will experience the sort of harm claimed by the San Carlos Apache. No other tribe has come forward claiming a religious interest in Mount Graham; indeed, we are aware of no similar challenges to the observatory project brought under NHPA. Moreover, the Administrative Record reveals that the Forest Service contacted all the tribes that it believed conceivably could have interests that might be affected by the observatory project, and several tribes provided input.
 
 
 58
 Finally, using 1985 as the relevant measuring date is justified by cases that have taken into account the failure of a party to avail itself of the opportunity to engage in the very process that it seeks to challenge. See, e.g., Foundation on Economic Trends v. Heckler, 587 F.Supp. 753, 765 (D.D.C.1984) (finding relevant that the plaintiffs "did not avail themselves of the right to comment ... afforded the general public"), aff'd in part and vacated in part on other grounds 756 F.2d 143 (D.C.Cir.1985); cf. National Parks and Conservation Ass'n v. Hodel, 679 F.Supp. 49, 53 (D.D.C.1987) (noting that the plaintiffs had known of the proposed facility and relevant modifications three years prior to filing suit). This conclusion is also supported by those cases that have considered both the date of the relevant agency action and the date that the parties became aware of the project. See, e.g., Friends of Yosemite v. Frizzell, 420 F.Supp. 390, 397 (N.D.Cal.1976) (finding unreasonable delay when suit was filed three years after the publicizing of the project, two years after the relevant agency action, and one year after construction had begun); Stow v. United States, 696 F.Supp. 857, 863 (W.D.N.Y.1988).
 
 
 59
 Our case-law, however, requires us additionally to consider "(1) whether the party attempted to communicate its position to the agency before filing suit, [and] (2) the nature of the agency response." Preservation Coalition, 667 F.2d at 854 (citing Coalition for Canyon Preservation, 632 F.2d at 779 (citation omitted)).[15] Application of these factors to this case does not change the analysis.
 
 
 60
 Although the Tribe failed to engage in the NHPA process prior to the issuance of the permit, it did make a subsequent aborted attempt to contact the Forest Service. The Tribe claims to have discussed the sacred character of Mt. Graham with the University on two occasions in late 1989, months after issuance of the permit. See Davis Dec'l pp 14-15; Victor Dec'l p 14. However, it is conceded that there was no attempt at that time to advise the Forest Service of the Tribe's position. See Victor Dec'l p 14. Subsequently, on August 31, 1990, a full year after construction commenced on the telescopes, the Forest Service received a letter from the Chairman of the Tribal Council. The letter explained that the University of Arizona had visited the Tribe a week before, but that the one week's grace period the University offered the Tribe to create a mitigation plan was inadequate. The letter further threatened legal action unless a response was received within 72 hours. See CR 36 Ex. J. The Forest Service responded on September 7, explaining its prior efforts to obtain input from the Tribe and expressing its willingness to consider any information the Tribe could provide on religious sites or proposals for mitigation. See CR 36 Ex. K. No response was received from the Tribe. Almost a year later, the Tribe sent a similar letter. The Forest Service responded that it would "be pleased to meet with the San Carlos Tribal Council and listen to their concerns," CR 36 Ex. M, and once again no response from the Tribe was forthcoming.
 
 
 61
 These brief communications do not constitute the sort of conduct that we have found previously to preclude a finding of unreasonable delay. This is not a case in which the plaintiffs pursued an alternative avenue of relief, see Park County, 817 F.2d at 618, or one in which the legal basis for relief was not then recognized, see Portland Audubon Soc'y, 884 F.2d at 1241. Nor is this a situation in which diligence otherwise was demonstrated. In this regard, the facts underlying the court's analysis in Preservation Coalition, Inc. v. Pierce, 667 F.2d 851 (9th Cir.1982), provide a useful contrast. There, the court considered, inter alia, a challenge under NEPA to the Department of Housing and Urban Development's failure to prepare an EIS which, if completed, would have detailed the environmental effects of demolishing certain buildings in downtown Boise as part of a redevelopment project. See id. at 853-54. The court refused to measure laches from the beginning of the NEPA review process (approximately 1971) for three reasons. First, the Coalition did not know that any historical buildings would be demolished until 1979, the year suit was filed. Second, the relevant agency action--a funding conversion--took place during the same year. Third, suit was filed immediately after the Coalition made its objections known through public meetings. See id. at 855. In this case, the Tribe (and thus members of the Coalition) had been informed in the mid-1980s that telescopes might be constructed on Mount Graham and yet purposefully shunned the NHPA process. Moreover, the Tribe did not bring suit until more than two years after the issuance of the special use permit. Finally, although the Tribe informed the Forest Service briefly and in general terms that it had objections to the issuance of the permit prior to filing suit, it ignored the Forest Service's prompt expression of its willingness to listen to the Tribe's concerns and proposals. The members of the Tribe then delayed filing for well over a year, and, all the while, construction of the facilities on Mount Graham proceeded apace.[16]
 
 
 62
 Accordingly, nothing in Preservation Coalition, or any of the other relevant cases, undermines our conclusion that 1985 is the appropriate date for starting the laches clock. See also City of Rochester v. United States Postal Serv., 541 F.2d 967, 977 (2d Cir.1976) (finding "several months of correspondence" insufficient to preclude a finding of inexcusable delay); In re Citizens and Landowners against the Miles City/New Underwood Powerline v. Secretary U.S. Department of Energy, 513 F.Supp. 257, 264 (D.S.D.1981) (finding a "few oral complaints" made shortly after the relevant agency action not to preclude laches), aff'd, 683 F.2d 1171 (8th Cir.1982). Furthermore, we have no difficulty finding that the six year period between 1985, when the Tribe first was solicited for input, and the date of filing suit constitutes unreasonable delay, particularly when the Coalition's filing came two years after the relevant agency action. See, e.g., Jicarilla Apache, 687 F.2d at 1338-39 (three year delay resulted in laches); National Parks, 679 F.Supp. at 53 (same); City of Rochester, 541 F.2d at 977 (finding inexcusable delay when suit was filed less than two years after the relevant agreement); Friends of Yosemite, 420 F.Supp. at 397 (finding sufficient delay when suit was filed "over 3 years after the project was publicized and over 2 years after [the relevant agency action]"); Smith v. Schlesinger, 371 F.Supp. 559, 561 (C.D.Cal.1974) (finding inexcusable delay when suit was filed over seven months after work on a project had begun). It is also relevant that the Coalition did not move for injunctive relief until eight months following the filing of the complaint, long after construction was underway. See Citizens & Landowners Against the Miles City/New Underwood Powerline v. Secretary U.S. Department of Energy, 683 F.2d 1171, 1176-77 (8th Cir.1982); Clarke, 342 F.Supp. at 1329. In short, a finding of inexcusable delay in this case is especially appropriate because "[t]he history leading up to the filing of this case ... is a clear case of parties sleeping on their rights." In re Citizens, 513 F.Supp. at 264; cf. Portland Audubon Soc'y, 884 F.2d at 1241 (expressing concern that "a plaintiff [might] 'sandbag[ ]' a defendant by bringing a late suit").
 
 
 63
 (c)
 
 
 64
 It still must be inquired if the Coalition's NHPA claim before this court properly is limited only to those violations of NHPA that related to the issuance of the special use permit, or whether the Coalition, as it contends, also charged the Forest Service with failing to fulfill ongoing duties under NHPA that would support a claim based on continuing violations of the Act. If Appellants properly may raise a claim for the post-permit period, the above analysis of inexcusable delay would not apply to that claim.
 
 
 65
 We agree with Respondents that the Coalition's challenge was restricted initially to the issuance of the permit. In its complaint, the Coalition alleged that its claims arose out of the Forest Service's errors "in planning and approving a telescope project" on Mount Graham, and that "th[is] action alleges that the Forest Service granted a Special Use Permit to the Arizona Board of Regents and the University of Arizona ... in violation of the United States Constitution and various federal statutes." Complaint p 1 at 1-2 (emphasis added). These allegations were incorporated into the NHPA cause of action, and nowhere did the Coalition allege the violation of any continuing duty.
 
 
 66
 The complaint, however, does not control the issues properly before this court. We have held previously that, when issues are raised in opposition to a motion to summary judgment that are outside the scope of the complaint, "[t]he district court should have construed [the matter raised] as a request pursuant to rule 15(b) of the Federal Rules of Civil Procedure to amend the pleadings out of time." Johnson v. Mateer, 625 F.2d 240, 242 (9th Cir.1980) (citing Jackson v. Hayakawa, 605 F.2d 1121, 1129 (9th Cir.1979), cert. denied, 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980)); see also Seaboard Terminals Corp. v. Standard Oil Co., 104 F.2d 659, 660 (2d Cir.1939) (per curiam). See generally 10A Wright & Miller, supra, Sec. 2721, at 43-46 ("The formal issues framed by the pleadings are not controlling on a motion for summary judgment; the court must consider the issues presented in other material offered by the parties....").
 
 
 67
 Before the district court, the Coalition appeared to argue both that the section 106 process that led to the approval of the special use permit was defective, see, e.g., Plaintiff's Statement of Facts in Opposition to Summary Judgment at 5, and that NHPA imposes "ongoing obligation[§ on the part of] the agency to evaluate ongoing project[s]," Plaintiff's Response and Opposition to Defendant's Motion for Summary Judgment at 21 [hereinafter Summary Judgment Opposition]. The regulations promulgated by the Advisory Council recognize that an obligation to undertake additional section 106 process is triggered (1) when the implementing agency discovers previously unidentified properties that are eligible for inclusion in the National Register, see 36 C.F.R. Sec. 800.11(b)(2) (1989); (2) when stage-by-stage compliance with NHPA is contemplated, see id. Sec. 800.3(c); Morris County Trust, 714 F.2d at 279-81; National Indian Youth Council, 501 F.Supp. at 676-77; or (3) when a modification, over which a federal agency has power to authorize, occurs with respect to a project for which NHPA review previously had been completed, see 36 C.F.R. 800.2(o) (1989); WATCH v. Harris, 603 F.2d 310, 325-26 (2d Cir.) (requiring additional section 106 process when there is both an "initial approval and additional approvals in an ongoing undertaking"), cert. denied, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979); accord Vieux Carre Property Owners v. Brown, 948 F.2d 1436, 1445 (5th Cir.1991); Morris County Trust, 714 F.2d at 279-81.
 
 
 68
 Although Appellants alluded in their papers to the Forest Services's "ongoing obligations" under NHPA in a general manner, see, e.g., Plaintiff's Response to Government's Motion for Protective Order at 5, 18 [hereinafter Protective Order Response]; Plaintiff's Reply to Opposition to Motion to Compel Discovery at 8; Summary Judgment Opposition at 21, only the first of the triggering events described above was alleged below with sufficient distinctness such that the district court should have treated the scope of the case expanded to the post-permit period. See Plaintiff's Response to Intervenor's Reply Mem. in Support of Summary Judgment at 6 ("However, when new and significant information is brought to the attention of the responsible agency, the NHPA 106 process must be re-opened and the new information considered.... Thus, [Appellants] find themselves before this court, seeking to enforce defendant's ongoing NHPA obligations."); see also Response to Gov'ts Motion for a Protective Order at 5 ("Although NHPA imposes an ongoing obligation on the agency, Defendants persist in ignoring repeated pleas from the Apache and the Plaintiffs.").[17]
 
 
 69
 In this case, however, as discussed above, the very information that the Coalition now wants the Forest Service to consider--the asserted importance of Mount Graham to San Carlos Apache religious practices and culture--would have been brought to the agency's attention by the Tribe had it not consistently ignored the NHPA process. See supra pp. 912-13. In these circumstances, we think it would undermine the policies behind the laches doctrine, as well as the justifications for requiring an agency to conduct additional NHPA review when previously undiscovered cultural resources are identified, to treat the asserted violation of this "ongoing" duty in this case as distinct from the claim that the original section 106 process was defective for the purposes of determining inexcusable delay. Had the Tribe participated in the process, the Coalition could not now claim that the information that it subsequently brought to the Forest Service's attention was "new." Indeed, a contrary result would give parties that an agency seeks to consult under NHPA incentives not to participate in the process: even if the agency would, after appropriate consideration of the information, go forward with the project, an entity such as the Tribe could hold back some evidence of the existence of cultural resources until after the project had been approved, and then receive a second bite at the apple (and perhaps an injunction) by bringing forward the previously withheld information. Such sandbagging of agency decisionmakers clearly was not contemplated by Congress. Cf. Portland Audubon Soc'y, 884 F.2d at 1241.
 
 
 70
 Accordingly, we conclude that the Coalition brought its NHPA claims with inexcusable delay.
 
 2. Undue Prejudice
 
 71
 The second component of laches is undue prejudice. See, e.g., Portland Audubon Soc'y, 884 F.2d at 1241; Daingerfield Island, 920 F.2d at 37. Prejudice in this context must be measured by "what Congress defines as prejudice." Coalition For Canyon Preservation, 632 F.2d at 780. The primary concern is whether the harm that Congress sought to prevent through the relevant statutory scheme is now irreversible, see Park County, 817 F.2d at 618, or is reversible only at undue cost to the relevant project, see Coalition for Canyon Preservation, 632 F.2d at 781; Friends of Yosemite, 420 F.Supp. at 398; see also Daingerfield Island, 920 F.2d at 40 (recognizing a balancing approach in principle); Stow, 696 F.Supp. at 863 (similarly articulating a balancing approach). Thus, courts evaluating prejudice in analogous contexts have focused not solely on the amount of money spent in dollar terms on a project, but on "the degree to which construction is complete," Daingerfield Island, 920 F.2d at 38-39 (citing Preservation Coalition, 667 F.2d at 855), and on the "percentage of estimated total expenditures disbursed at the time of suit," id. at 38.
 
 
 72
 At the time the plaintiffs filed their complaint, the construction of the telescopes was 35% complete and a total of almost $4,000,000 had been expended. See Powell Dec'l, CR 53 Tab D at 5, app. at 10. By the time Appellants moved for a preliminary injunction, the amount of expenditures had doubled, and the cost of delay was estimated at almost $11,000 per day. Id.[18] Not only has a substantial percentage of the project been completed, but also the portion that is complete includes much of the basic infrastructure that will alter permanently the character of the mountain. Thus, although it is true that a number of cases have refused to find higher degrees of completion to evince prejudice, see, e.g., Coalition for Canyon Preservation, 632 F.2d at 779 (citing cases), the nature of the expenditures in this case indicates that "it would be difficult to alter the basic plan," id.
 
 
 73
 Of course, our cases indicate that the degree of completion is only one factor to be taken into consideration. See, e.g., Preservation Coalition, 667 F.2d at 855 ("Delay may be prejudicial if substantial work has been completed before the suit was brought, but even substantial completion is sometimes insufficient to bar suit." (emphasis in original)). In this case, two additional factors are of decisive significance. First, it is important to note that the Coalition complains most vociferously that the entire mountain is sacred, and that the mere presence of the telescopes significantly interferes with their religious practices. See, e.g., Complaint p 6 ("As a result of the Forest Service's illegal failure to identify and protect Mt. Graham as a traditional cultural property, the mountain's religious, spiritual and cultural values will be destroyed...."); Davis Dec'l p 18 ("The telescope project will destroy our way of life.... I am asking the court to stop the project, to not let the construction begin again." (emphasis added)); Appellants' Opening Brief at 36-37, 42-43; Appellants' Reply Brief at 15-22. NHPA, of course, does not mandate that the presence of properties eligible for inclusion in the National Register bars a project from going forward; rather, it only requires that, "prior to the issuance of any license" a federal agency must "take into account the effect of the undertaking" on those properties. 16 U.S.C. Sec. 470f (1988) (emphasis added); see also e.g., Wisconsin Heritages, Inc. v. Harris, 490 F.Supp. 1334, 1341-42 (E.D.Wis.1980) (finding the concurrence of the Advisory Council on Historical Preservation unnecessary when the agency took their recommendations into account). In light of AICA and the progress of the telescope project on Emerald Peak to date, it is clear to us that, even if an injunction were issued pending completion of the NHPA process (assuming NHPA indeed has been violated), the telescopes would not be removed from the mountain. Thus, in large measure, the harm Appellants fear has become irreversible.
 
 
 74
 Second, we cannot ignore that what spurred Congress to pass AICA was fear that further delays in the construction of the telescopes might result in a loss of the project to a foreign site or the breakdown of the international coalition that supported the project. See, e.g., Red Squirrel II, 954 F.2d at 1454 (noting that one of the motivations for the legislation was that "the German participants in the international consortium had threatened to withdraw if construction of the observatory was not quickly approved"). This remains a vital concern to those involved in the project. See Strittmatter Dec'l, CR 53 Tab F at 2 ("[D]elays could seriously jeopardize negotiations with other potential participations in the Mt. Graham International Observatory...."); Id. Tab G at 1-2 ("Because of the significant past delays in moving forward ... the Italian members of the Project have repeatedly indicated that there is a real possibility that the Italians will have to withdraw from [the project] and seek partnership in another large mirror telescope project elsewhere in the world if there are any further delays in the construction of the observatory.").
 
 
 75
 Therefore, the broad purpose behind AICA indicates that we should find delaying construction of three telescopes highly prejudicial. See Red Squirrel II, 954 F.2d at 1454 (" 'Three telescopes will be built immediately. They can no longer be stalled by process, by litigation, or by whim.' " (quoting 134 Cong.Rec. Sec. 15,740 (daily ed. Oct. 13, 1988) (statement of Sen. McCain))); id. ("This legislation injects certainty. It makes clear to the public, the courts, and the agencies of government that three telescopes will be built on Mount Graham immediately...." (quoting 134 Cong.Rec. Sec. 15,740 (daily ed. Oct. 13, 1988) (statement of Sen. DeConcini))). Accordingly, although we express no opinion concerning whether AICA effected an implied repeal of NHPA with respect to the three telescopes planned for Emerald Peak, we find that causing that project further delay at this point, assuming arguendo that further NHPA compliance is required, would result in significant prejudice. When this source of prejudice is added to the extent of expenditures and the irreversibility of the project, we have little difficulty determining that to permit the Coalition to assert its NHPA claim would result in undue prejudice to the Respondents that clearly outweighs any potential benefit to Appellants.[19]
 
 
 76
 * * * * * *In this case, there is no doubt that laches has sound application. The San Carlos Apache, with full knowledge of the impending construction of the observatory on Mount Graham, were content to stand on the sidelines while the federal agencies undertook their administrative duties. Only after substantial work on the observatory complex had been completed did they raise objections, and even then without a reasonable amount of diligence. Therefore, we conclude that the Coalition's NHPA claim is barred by laches.
 
 Conclusion
 
 77
 Because we hold that Title VI of AICA is constitutional and the Coalition's NHPA claim barred by laches, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 See Mount Graham Red Squirrel v. Espy, 986 F.2d 1568 (9th Cir.1993); Mount Graham Red Squirrel v. Madigan, 954 F.2d 1441 (9th Cir.1992); Mount Graham Red Squirrel v. Yeutter, 930 F.2d 703 (9th Cir.1991)
 
 
 [2]
 Section 106, the operative section of NHPA, provides:
 The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking.
 16 U.S.C. Sec. 470f (1988). The Advisory Council has promulgated regulations to guide agencies' implementation of these requirements. See 36 C.F.R. Sec. 800 et seq. (1993); 16 U.S.C. Sec. 470s (1988).
 
 
 [3]
 The "shrines" consisted of a number of artifacts, including cairns and pottery shards, that were scattered in a manner that suggested their use in religious activities. See Admin.Rec.Supp. Exs. 10, 20
 
 
 [4]
 Apparently, the Tribe had passed a resolution to this effect in July 1990
 
 
 [5]
 The complaint also alleged violations of NFMA and the APA; the Coalition, however, has declined to pursue these claims on appeal
 
 
 [6]
 The Coalition agrees that their appeal of the district court's denial of their motion for a preliminary injunction has merged with their appeal of the grant of summary judgment
 
 
 [7]
 The proposed language read as follows:
 Notwithstanding any other act, law, rule or regulation, the Secretary of Agriculture is hereby authorized and directed to enter into a land use agreement with the ... University of Arizona for the establishment of the Mt. Graham International Observatory Research Site.
 Quoted in Red Squirrel II, 954 F.2d at 1446.
 
 
 [8]
 These included NEPA, NFMA, the Federal Land Policy and Management Act of 1976, 43 U.S.C. Sec. 1701 et seq. (1988), the Oregon-California Railroad Land Grant Act, 43 U.S.C. Sec. 1181a (1988), and the Migratory Bird Treaty Act, 16 U.S.C. Sec. 703 et seq. (1988). See Robertson, --- U.S. at ----, 112 S.Ct. at 1413. None of these provisions were mentioned specifically in the relevant statutory language. See id. at ----, 112 S.Ct. at 1411-12 n. 2
 
 
 [9]
 Compare Northwest Timber Compromise Sec. 318(b)(6)(A) (stating that the new subsections provide "adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases") with AICA Sec. 607 (providing that ESA Sec. 7 shall be deemed satisfied "subject to the terms and conditions of Reasonable and Prudent Alternative Three")
 
 
 [10]
 Of course, the statute does not expressly substitute the requirements of Alternative Three for those of NEPA. See AICA Sec. 607. However, as discussed in Red Squirrel II, it is clear that the intent of Congress was to replace the requirements of both NEPA and ESA with those of Alternative Three. See Red Squirrel II, 954 F.2d at 1452-59
 The Coalition also argues that Robertson is distinguishable because AICA, unlike the Northwest Timber Compromise, provides no express provision for judicial review. However, judicial review of AICA's requirements is available through the APA. See Mount Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir.1993).
 
 
 [11]
 The district court, in denying the Coalition's motion for a preliminary injunction, clearly relied on laches. See Memorandum and Order Denying Motion for Preliminary Injunction at 18-20 (Apr. 10, 1992). It then granted Respondents' partial summary judgment for "all the reasons fully set forth" in the memorandum denying the preliminary injunction. Memorandum and Order Granting Defendant's Motion for Summary Judgment at 1-2 (May 29, 1992)
 
 
 [12]
 We note that a declaratory judgment, because it is equitable in nature, can be barred by laches. See Abbott Labs. v. Gardner, 387 U.S. 136, 155, 87 S.Ct. 1507, 1519, 18 L.Ed.2d 681 (1967)
 
 
 [13]
 Cf. Committee to Save the Fox Building v. Birmingham Branch of the Federal Reserve Bank, 497 F.Supp. 504, 513 (N.D.Ala.1980) (holding that laches should bar a NHPA claim for the same reasons that a NEPA claim was barred)
 
 
 [14]
 Our prior decisions have announced no general rule for determining the appropriate point from which laches runs in the environmental context. See Preservation Coalition, 667 F.2d at 854-55; Coalition for Canyon Preservation, 632 F.2d at 780 & n. 2
 
 
 [15]
 The third factor, "the extent of actions, such as preparatory construction, that tend to motivate citizens to investigate legal bases for challenging an agency action," id. at 854, is discussed above. The Tribe clearly was aware of the project and the Forest Service's ongoing NHPA review as early as 1985
 
 
 [16]
 Similarly, sufficient diligence was found in Coalition for Canyon Preservation v. Bowers, 632 F.2d 774 (9th Cir.1980) (dicta), when the final agency action was taken in May 1978, construction began in November, and suit was filed six weeks after that. See id. at 780. In addition, the plaintiffs had engaged in a "campaign of letter writing and gathering [of] signatures" in favor of a contrary proposal for the two years prior to the suit. See id. In this case, not only was the complaint filed over two years after the relevant agency action, but also no similar sustained attempt to advise the Forest Service of the Tribe's specific concerns took place
 
 
 [17]
 The Coalition also alluded to "changes in the location of the project, and changes in the scope and nature of the planned project" without further specification. Protective Order Response at 18. Additionally, Appellants speculated that undiscovered cultural resources might exist on Emerald Peak. See Summary Judgment Opposition at 21. We note that one of Appellants' contentions in this case is that the district court erroneously restricted review to the administrative record and improperly denied Appellants discovery on their post-permit NHPA claim prior to summary judgment. Because Appellants failed to identify with any specificity additional circumstances that might have triggered the need for further compliance with NHPA Sec. 106, however, we find it unnecessary to decide this question. Even if Appellants otherwise were entitled to discovery, it was within the district court's discretion to deny it when, as in this case, the complaining party could only speculate as to what it might discover. See Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades Distr. Council, 817 F.2d 1391, 1395 (9th Cir.1987) ("The mere hope that further evidence may develop prior to trial is an insufficient basis for a continuance under Fed.R.Civ.P. 56(f)."); American Legion v. Derwinski, 827 F.Supp. 805, 812 (D.D.C.1993) (denying request for discovery in a record review case when plaintiffs only "proferr[ed] speculation" as to what they might discover); cf. First Nat'l Bank v. Cities Servs. Co., 391 U.S. 253, 294, 88 S.Ct. 1575, 1595, 20 L.Ed.2d 569 (1968) (finding no error in denying further discovery when the "petitioner has only speculation as to what discovery ... would reveal"). See generally 10A Wright & Miller, supra, Sec. 2741, at 561
 
 
 [18]
 Although this court in Coalition for Canyon Preservation stated that the cost of delay cannot be considered because "NEPA by is very nature contemplates such delay," Coalition for Canyon Preservation, 632 F.2d at 780, this statement must be taken in the context of the following sentence which emphasized that mere increased cost due to delay "is not alone sufficient prejudice to warrant a finding of laches," id. (emphasis added). Indeed, our subsequent cases have interpreted Coalition for Canyon Preservation precisely in this manner. See, e.g., Preservation Coalition, 667 F.2d at 855 ("[I]ncreased cost from delay is alone not sufficient to establish prejudice." (citing Coalition for Canyon Preservation ) (emphasis added))
 
 
 [19]
 The plaintiffs have submitted to the court two letters that they believe indicate that one of the three telescopes that was originally planned for Emerald Peak might be relocated, and request that we take judicial notice of this development. We decline the invitation. The letters in no manner indicate that the relocation will take place. Indeed, one letter, from the Department of Fish and Wildlife to the Maricopa Audubon Society, specifically notes that to do so probably would violate the terms of Reasonable and Prudent Alternative Three. Finally, the Coalition does not contend that construction of the third telescopes will cause them a harm different from that already caused by the construction of the first two. Thus, even if we considered the letters, they would not change our prejudice calculus