**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KLAMATH SISKIYOU WILDLANDS
CENTER; UMPQUA WATERSHEDS;
CASCADIA WILDLANDS PROJECT,
   *Plaintiffs-Appellants,*

    v.

LYNDA BOODY, in her official
capacity as Glendale Field
Manager,
     *Defendant,*

   and

BUREAU OF LAND MANAGEMENT, an
agency of the United States
Department of the Interior;
KATRINA SYMONS, in her official
capacity as Glendale Field
Manager; WILLIAM HAIGH, in his
official capacity as South River
Field Office Manager on the
Roseburg District, BLM,
   *Defendants-Appellees,*

D.R. JOHNSON LUMBER COMPANY,
an Oregon corporation,
   *Defendant-intervenor-*
      *Appellee.*

No. 06-35214

D.C. No.
CV-03-03124-JPC

OPINION

Appeal from the United States District Court
for the District of Oregon
John P. Cooney, Magistrate Judge, Presiding

Argued and Submitted
October 16, 2006—Seattle, Washington

18221

Filed November 6, 2006

Before: Dorothy W. Nelson, David R. Thompson, and
Richard A. Paez, Circuit Judges.

Opinion by Judge D.W. Nelson

## COUNSEL

Stephanie M. Parent, Pacific Environmental Advocacy Center, Portland, Oregon, and Erin Madden, Portland, Oregon, briefed for the appellants. Ms. Parent argued for the appellants.

Brian Perron, U.S. Department of the Interior, Portland, Oregon, Sue Ellen Wooldridge, Lisa E. Jones, Brian C. Toth, and Anna T. Katselas, U.S. Department of Justice, Washington, D.C., briefed for the government appellees. David C. Shilton, U.S. Department of Justice, Washington, D.C., argued for the government appellees.

Scott W. Horngren and Shay S. Scott, Haglund, Kelley, Horngren, Jones & Wilder LLP, Portland, Oregon, briefed for the intervenor-appellee. Mr. Scott argued for the intervenor-appellee.

**OPINION**

D.W. NELSON, Senior Circuit Judge:

Klamath Siskiyou Wildlands Center, Umpqua Watersheds, and Cascadia Wildlands Project (collectively, "KS Wild") appeal the district court's finding that the Bureau of Land Management's ("BLM's") 2001 and 2003 annual species review decisions regarding the red tree vole were lawful. KS Wild also appeals the district court's finding that the Cow Catcher and Cottonsnake timber sales were valid and should be permitted to go forward. The district court determined that BLM's decisions did not violate the Federal Land Policy & Management Act ("FLPMA") or the National Environmental Policy Act ("NEPA"). We reverse the judgment of the district court and direct the entry of an injunction enjoining the Cow Catcher and Cottonsnake timber sales from going forward.

## I.    FACTUAL & PROCEDURAL HISTORY

In 1994, the federal government adopted a comprehensive forest management plan known as the Northwest Forest Plan ("NWFP"). The NWFP amended the resource management plans for many BLM districts, including the Roseburg and Medford districts at issue in this case, by allocating lands amongst several administrative categories throughout 24.4 million acres in the Pacific Northwest.

In addition to the land allocations, the NWFP also established Survey and Manage requirements to provide additional protections for species that might not be adequately protected by the broad-scale land allocations. The NWFP's Survey and Manage requirements protected over 400 species of amphibians, mammals, bryophytes, mollusks, vascular plants, fungi, lichens, and arthropods within the northern spotted owl range. The red tree vole was one of the protected species.

In 2001, BLM and the Forest Service amended the NWFP by issuing the Record of Decision for Amendments to the

Northwest Forest Plan ("2001 ROD"). The agencies prepared a Final Supplemental Environmental Impact Statement ("2000 FSEIS") providing evidentiary support and extensive scientific analysis for the 2001 ROD.

The 2001 ROD made two significant changes to the NWFP pertinent to this case. First, it modified the Survey and Manage species protections by expanding from a four-category to a six-category classification system. It assigned the red tree vole to Category C, which requires (1) management of high-priority sites, (2) pre-disturbance surveys, and (3) strategic surveys prior to any agency action that would disturb the species' habitat. Second, the 2001 ROD created the Annual Species Review ("ASR") process, which requires BLM to acquire, evaluate, and apply new information to implement changes or refinements to the Survey and Manage classifications.

On June 14, 2002, after completing its first ASR regarding the red tree vole, BLM issued a memorandum downgrading the red tree vole's Survey and Manage classification from Category C to Category D (the "2001 ASR Decision").[1] In contrast to the protections afforded species listed under Category C, BLM is not required to conduct pre-disturbance surveys for species listed under Category D. On December 19, 2003, BLM issued a second memorandum removing the vole's Survey and Manage designation entirely (the "2003 ASR Decision").[2]

On June 16, 2003, BLM issued an environmental assessment ("EA") for the Cow Catcher timber sale. In accordance

---

[1]The memorandum was formally issued in June, 2002, yet the change was the result of the 2001 ASR, and it is referred to as the "2001 ASR Decision."

[2]Both the 2001 and 2003 ASR Decisions (collectively the "ASR Decisions") applied only to the vole's mesic (central) zone of its range. The timber sales at issue in this case are both within this zone.

with its 2001 ASR Decision downgrading the vole to Category D, BLM did not conduct pre-disturbance surveys for the vole. On August 25, 2003, BLM issued a Finding of No Significant Impact ("FONSI") for the Cow Catcher sale, which was ultimately awarded to D.R. Johnson Lumber Co. ("D.R. Johnson"), the defendant-intervenor in this case.

Also in June, 2003, BLM released an EA for the Cottonsnake timber sale in which BLM acknowledged that if any vole nests existed within the units to be harvested "they would likely be destroyed." On August 28, 2003, BLM issued a FONSI for the Cottonsnake sale, which has not yet been awarded.

On December 30, 2003, KS Wild filed a complaint, seeking to enjoin the Cow Catcher and Cottonsnake timber sales, and to invalidate the ASR Decisions on the grounds that (1) they violated FLPMA, (2) they were invalid under NEPA, and (3) they were the product of arbitrary and capricious agency action. The district court issued a preliminary injunction, and both parties moved for summary judgment. On June 6, 2005, Magistrate Judge Cooney issued his Findings and Recommendations regarding the parties' cross-motion for summary judgment, and on February 21, 2006, the district court issued a final order, adopting the Findings and Recommendations in part, and denying relief on KS Wild's FLPMA, NEPA, and arbitrary and capricious claims. In light of these findings, the court also found no basis upon which to enjoin BLM or D.R. Johnson from going forward with the timber sales. KS Wild timely appealed to this court.

We conclude that the district court erred in granting summary judgment in favor of BLM. The 2001 and 2003 ASR Decisions are invalid under both FLPMA and NEPA, and because we set the decisions aside on these grounds, we need not reach KS Wild's arbitrary and capricious claim.

## II.  STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005). Agency decisions that allegedly violate NEPA and FLPMA are reviewed under the Administrative Procedure Act ("APA"), and may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A) (2005)).

## III.  ESTOPPEL

We must first decide whether two of the appellants, Klamath Siskiyou Wildlands Center and Umpqua Watersheds ("KSWC/UW"), should be estopped from bringing this appeal.[3] D.R. Johnson alleges—in an argument not joined by BLM— that KSWC/UW should be estopped on grounds of judicial estoppel and laches. We reject both arguments.

### 1.  Judicial Estoppel

[1] "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). Thus, "an inconsistent factual or legal position is a threshold requirement of the doctrine." *United States v. Lence*, 455 F.3d 1047, 1051 (9th Cir. 2006).

---

[3]The third appellant in this case, Cascadia Wildlands Project, was not a party to the previous proceedings upon which D.R. Johnson bases its estoppel arguments. Instead, D.R. Johnson argues Cascadia has no standing to challenge the Cow Catcher sale because it failed to exhaust its administrative remedies. Because we hold that KSWC/UW are not estopped from pursuing this appeal, and KSWC/UW's standing is not in question, we need not address D.R. Johnson's standing argument regarding Cascadia.

D.R. Johnson argues that in a previous action, *Northwest Ecosystem Alliance v. Rey*, 2006 WL 44361 (W.D. Wash. Jan. 9, 2006), KSWC/UW successfully invalidated a 2004 Record of Decision ("2004 ROD," which temporarily replaced the 2001 ROD) on the basis that the 2001 ROD should remain in effect. D.R. Johnson alleges KSWC/UW should be estopped from arguing in the instant case that the 2001 and 2003 ASR Decisions are unlawful. D.R. Johnson's argument is without merit.

In *Rey*, KSWC/UW sought to preserve the ASR process, arguing that additional time was needed to give the process a chance to work. However, in the instant case, KS Wild is challenging the ASR Decisions regarding the red tree vole, *not* the entire ASR process. KSWC/UW argued in *Rey* that the 2004 ROD, which completely eliminated the Survey and Manage strategy, was not supported by a thorough, reasoned analysis regarding the likely impacts of the decision. *See Rey*, 2006 WL 44361, at *2. Asserting that the 2001 ROD is an effective forest management strategy is quite different than arguing that *all* agency actions ostensibly taken pursuant to that strategy are lawful. Moreover, the only reasonable relief that KSWC/UW could seek under the Administrative Procedure Act in *Rey* was to have the district court reinstate the 2001 ROD. *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force.").

**[2]** In *Rey* KSWC/UW supported the 2001 ROD and the ASR process only insofar as they sought to invalidate the 2004 ROD. Therefore, the record indicates that KSWC/UW have not taken a "clearly inconsistent position" in this action, and judicial estoppel does not apply.

### 2.  Laches

**[3]** D.R. Johnson's laches argument also fails. To demonstrate laches, a party must establish "(1) lack of diligence by

the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Apache Survival Coalition v. United States*, 21 F.3d 895, 905 (9th Cir. 1994). D.R. Johnson has established neither requirement.

[4] D.R. Johnson alleges that KSWC/UW showed lack of diligence by "abandoning" an earlier action, *Oregon Natural Resource Council Fund v. Veneman*, Civ. No. 02-983-AA (D. Or.), in which they challenged the 2001 ROD. However, *Veneman* was dismissed *without prejudice* on December 15, 2003, *id.*, and KS Wild filed its complaint in the instant case on December 30, 2003. This does not show a lack of diligence.

[5] Moreover, D.R. Johnson alleges it has been prejudiced by the "delay" because it has needed the timber from the Cow Catcher sale throughout the pendency of this litigation. This is not the type of irreversible harm that is properly considered in a laches analysis. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381 n.9 (9th Cir. 1998) ("We know of no case in which a private company's economic loss was considered pertinent to the analysis of a laches defense."); *Apache Survival Coalition*, 21 F.3d at 912 (holding that prejudice must be "what Congress defines as prejudice. The primary concern is whether the harm that Congress sought to prevent . . . is now irreversible.") (internal quotations omitted). Furthermore, laches is disfavored in environmental cases because the public at-large, and not just the plaintiffs, will be harmed by environmental damage. *Id.* at 905. Therefore, laches does not estop KSWC/US from bringing this appeal.

## IV.   THE FLPMA CLAIM

The Federal Land Policy & Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785 (2006), establishes requirements for land use planning on public land, including the land covered by the NWFP. FLPMA requires that BLM, under the Secre-

tary of the Interior, "develop, maintain, and when appropriate, revise land use plans" to ensure that land management be conducted "on the basis of multiple use and sustained yield." 43 U.S.C. §§ 1701(a)(7), 1712(a); *see also Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1067 (9th Cir. 2002) (holding that FLPMA "requires the BLM to prepare [resource management plans] for the various districts under its control."). The process for developing, maintaining, and revising resource management plans is controlled by federal regulations at 43 C.F.R. §§ 1601.0-1610.8 (2006).

**[6]** Under FLPMA, if BLM wishes to change a resource management plan, it can only do so by formally amending the plan pursuant to 43 C.F.R. § 1610.5-5. Section 1610.5-5 states, in pertinent part:

> . . . An amendment shall be initiated by the need to consider monitoring and evaluation findings, new data, new or revised policy, a change in circumstances or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions and decisions of the approved plan. An amendment shall be made through an environmental assessment of the proposed change, or an environmental impact statement, if necessary, public involvement as prescribed in § 1610.2 of this title, interagency coordination and consistency determination as prescribed in § 1610.3 of this title and any other data or analysis that may be appropriate. . . .

*Id.* Thus, BLM *must* amend a management plan when an action is proposed that changes either "the scope of resource uses" or the "terms, conditions and decisions" of the plan.

**[7]** Not all changes to a plan, however, require formal amendment. BLM may take steps to "maintain" plans under 43 C.F.R. § 1610.5-4, which permits maintenance

as necessary to reflect minor changes in data. Such maintenance is limited to further refining or documenting a previously approved decision incorporated in the plan. Maintenance shall not result in expansion in the scope of resource uses or restrictions, or change the terms, conditions, and decisions of the approved plan. Maintenance is not considered a plan amendment and shall not require the formal public involvement and interagency coordination process described under §§ 1610.2 and 1610.3 of this title or the preparation of an environmental assessment or environmental impact statement. Maintenance shall be documented in plans and supporting records.

43 C.F.R. § 1610.5-4.

BLM concedes it did not take formal steps to amend the 2001 ROD. Instead, BLM asserts the ASR Decisions maintain the 2001 ROD in accordance with § 1610.5-4, and that the requirements of § 1610.5-5 are inapposite. Accordingly, BLM argues it was not required to formally amend the resource management plans, nor was it required to comply with the environmental assessment, environmental impact statement, public disclosure, and interagency coordination requirements in § 1610.5-5.

[8] We disagree. It is clear the 2001 and 2003 ASR Decisions amended the resource management plans. They resulted from the need to consider new information regarding the red tree vole and they changed the terms and conditions of the plans without complying with § 1610.5-5. Therefore, the ASR Decisions violated FLPMA.

[9] As explained in Part II, *supra*, the 2001 ASR Decision downgraded the red tree vole's Survey and Manage designation from Category C to Category D, and the 2003 Decision removed the red tree vole from Survey and Manage protection entirely. The ASR Decisions cannot reasonably be defined as

"plan maintenance" under FLPMA because the decisions—
even if made pursuant to the ASR process—do nothing short
of "amend" the resource management plans.

First, §§ 1610.5-4 (defining plan maintenance actions) and
1610.5-5 (defining plan amendments) are not equal in scope:
the former is more narrow. Section 1610.5-4 limits plan main-
tenance to actions that "reflect minor changes in data" and are
"limited to further refining or documenting a previously
approved decision incorporated in the plan." In contrast,
§ 1610.5-5 requires plan amendments whenever there is a
"need to consider monitoring and evaluation findings, new
data, new or revised policy, [or] a change in circumstances."

BLM states the ASR Decisions were based on data 80% of
which was new. It is plainly unreasonable to assert that this
qualifies as a *minor* change in data under § 1610.5-4. More-
over, by comparing § 1610.5-4 with § 1610.5-5, it is evident
the latter captures a wider spectrum of agency action. These
provisions were created as complements, and taken together
they ensure that whenever resource management plans are
changed in any meaningful way, the changes must be made
via amendment (i.e., supported by scientific environmental
analysis and public disclosure). This is consistent with
FLPMA's requirement that BLM ensure the "views of the
general public" and "third-party participation" are adequately
incorporated into the land planning process. *See* 43 U.S.C.
§ 1701(a)(5); 43 C.F.R. § 1610.2. This interpretation is also
supported by provisions of FLPMA that require BLM to man-
age public lands in accordance with resource management
plans once they have been established. *See* 43 U.S.C.
§ 1732(a); 43 C.F.R. § 1610.5-3(a); *see also Norton v. S. Utah
Wilderness Alliance*, 542 U.S. 55, 69 (2004) (observing that
the statutory directive in 43 U.S.C. § 1732(a) "prevent[s]
BLM from taking actions inconsistent with the provisions of
a land use plan.").

Second, § 1610.5-5 clearly requires a formal plan amend-
ment anytime a proposed action changes a "term, condition,

or decision" of a resource management plan. BLM argues that the Survey and Manage designations created by the 2001 ROD were not intended as a rigid set of requirements that would remain the same over the life of the resource management plans, and that the ASR Decisions did not change the terms of the 2001 ROD because shifting species between Survey and Manage designations was expected.

BLM is partly correct: the 2001 ROD contemplated that moving a species from one survey strategy to another or dropping Survey and Manage protection for any species whose status is determined to be more secure than originally projected could occur under the plan. However, merely because the 2001 ROD contemplated this type of change, it does not necessarily follow that all contemplated changes fall under the narrow definition of plan maintenance in § 1610.5-4. If that were the law, BLM could circumvent the mandates of § 1610.5-5 (i.e., requiring environmental assessments and impact statements, public disclosure, etc.) by merely designing a management plan that "contemplates" a wide swath of future changes. Not only would such a strategy flip the regulatory scheme created by §§ 1610.5-4 and 1610.5-5 on its head by defining plan maintenance broadly and plan amendments narrowly, it would render nugatory the provisions of FLPMA requiring BLM to act in accordance with established resource management plans. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3.

It is readily apparent that the ASR Decisions altered the terms and conditions of the Roseburg and Medford districts' resource management plans. Prior to the decisions, BLM was required to manage high-priority red tree vole sites, conduct pre-disturbance surveys to discover additional sites, and create a ten-acre buffer zone around each known site for every proposed timber sale. In contrast, after the decisions, BLM is not required to take steps to discover vole sites within a proposed harvest area. When it announced the Cottonsnake timber sale, BLM even recognized that vole surveys were no

longer required prior to logging, and if any undiscovered vole nests occurred within the units to be logged, they would likely be destroyed.

If BLM can modify the protection afforded a species under a resource management plan as dramatically as it has here—without complying with § 1610.5-5—BLM could ultimately remove all the Survey and Manage designations without ever conducting another EA or EIS, and without providing public disclosure. Such steps would undoubtedly run contrary to both the goals and language of FLPMA.

KS Wild urges us to also hold that the ASR Decisions violate § 1610.5-5 because changing the vole's Survey and Manage status resulted in a "change in the scope of resource uses." Because the ASR Decisions potentially increased the amount of timber to be harvested (measured as the Probable Sale Quantity ("PSQ")), KS Wild argues that the ASR Decisions should be deemed "amendments" on this basis alone.

We disagree. The PSQ is only a "rough approximation" of annual average timber sale volume. Although eliminating Survey and Manage protections for the vole will likely affect the PSQ, the 2000 FSEIS noted that "Alternatives 1 and 2 of this SEIS are estimated to achieve 94 and 96 percent of the declared PSQ level, respectively, well within the 'rough approximation' and 'uncertainty' parameters" set forth in the NWFP. *See* FSEIS for Amendment to the Survey and Manage, Protection Buffer, and other Mitigation Measures Standards and Guidelines, Volume I - Chpts. 1-4 at 88 ("2000 FSEIS Standards and Guidelines"). The 2001 ROD ultimately adopted Alternative 1, and Alternative 2, as explained *infra*, closely resembles the 2001 and 2003 ASR Decisions. While the ASR Decisions may change the PSQ, the "scope of the resource uses" is still within the "rough approximation" set forth in the resource management plans and contemplated in the 2000 FSEIS Standards and Guidelines.

**[10]** Therefore, while we conclude the ASR Decisions violated § 1610.5-5, we do not base that finding on the "change in resource uses" provision. Changing the terms and conditions of the resource management plans are alone sufficient to require compliance with § 1610.5-5.

Third, the crux of BLM's argument is that the ASR process, and all decisions made pursuant to it, satisfy the environmental assessment, environmental impact statement, public involvement, and interagency cooperation requirements of FLPMA because the ASR process is supported by the 2000 FSEIS. However, even if adaptive management modifications were contemplated by the 2000 FSEIS, there must be limits to how dramatic "modifications" can be before they are deemed "amendments." Otherwise, as explained above, resource management plans could be designed in such an open-ended manner as to render § 1610.5-5 ineffectual.

More importantly, although BLM emphasizes the 2000 FSEIS expected Survey and Manage designations to be adjusted over the short-term for some species under the ASR process, there is no indication the red tree vole was one of those species. In fact, the opposite is true. The 2000 FSEIS clearly stated that red tree voles require extensive additional research and protection before any conclusions regarding the impact of logging could be reached. Before ultimately deciding to designate the vole as a Category C species, the 2000 FSEIS conducted an extensive taxonomical analysis of voles. The experts considered four possible strategies, one of which, "Alternative 2," would have initially placed voles in Category D then phased them out of Survey and Manage protection after five years. The 2000 FSEIS resoundedly rejected this strategy, stating that:

> Alternative 2 results in substantial effects and uncertainty on the future status of the red tree vole. . . . The requirement to only manage known sites . . . and to not conduct pre-disturbance surveys for future

> habitat-disturbing activities would increase the risk
> of losing sites needed to maintain connectivity
> throughout all three red tree vole distribution zones.
> This, in turn, would increase the risk of isolation of
> red tree vole populations and likely reduce gene
> flow. . . . [Thus,] Alternative 2 would provide inade-
> quate habitat to maintain stable populations of the
> species in all three red tree vole distribution zones
> due to the lack of connectivity . . . .

2000 FSEIS Standards and Guidelines at 392.

Notably, BLM's 2001 and 2003 ASR Decisions change the
vole's Survey and Manage designation in the same way it
would have changed under Alternative 2, which was flatly
*rejected* in the 2000 FSEIS. It is unreasonable for BLM to
argue that the 2000 FSEIS supports the ASR Decisions, and
that the decisions do not amount to changes in the "terms" or
"decisions" of the resource management plans, given the
unequivocal rejection of Alternative 2.

Finally, BLM emphasizes that adaptive management is at
the heart of the NWFP, and flexibility is a necessary element
of this strategy. BLM contends that pursuant to this adaptive
management approach, new information, which was discov-
ered after the 2000 FSEIS, prompted the ASR Decisions. Not
only does this weaken BLM's argument that the 2000 FSEIS
supports the ASR Decisions, but the 2000 FSEIS clearly
stated that even if changes to the vole's Survey and Manage
designation are made, the data necessary to make such
changes would not be available for several years:

> Alternative 2 creates uncertainty in how the species
> would be managed following the five-year interval.
> Given our limited knowledge of red tree vole popu-
> lation dynamics and ecology, the five-year time-
> frame is not likely to be sufficient for completion of
> the studies necessary to make an informed recom-

mendation to the species['] future disposition. . . .
Information on the genetic variation between these
small isolated populations, combined with studies of
red tree vole population trend[s], longevity, demo-
graphics, and population densities require collection
of data over several generations of red tree voles
(more than five years).

2000 FSEIS Standards and Guidelines at 392-93.

Given the 2000 FSEIS' unequivocal rejection of Alterna-
tive 2, BLM cannot sustain the argument that the FSEIS sup-
ported the ASR Decisions, especially when the 2001 ASR
Decision came within a matter of months of the 2001 ROD,
and both ASR Decisions occurred well before data sufficient
to warrant an amendment in the vole's status was available.

**[11]** BLM's ASR Decisions, even if ostensibly plan main-
tenance actions made pursuant to the ASR process, violate
FLPMA because the dramatic change in policy regarding the
vole's Survey and Manage designation cannot be reasonably
defined as anything other than a change in a "term or condi-
tion" in the resource management plans.

## V.   THE NEPA CLAIM

**[12]** The National Environmental Policy Act ("NEPA")
requires agencies considering "major Federal actions signifi-
cantly affecting the quality of the human environment" to per-
form an "environmental impact statement." 42 U.S.C.
§ 4332(2)(C) (2006); *Nw. Environ. Advocates v. Nat'l Marine
Fisheries Serv.*, 460 F.3d 1125, 1132 (9th Cir. 2006). An
environmental impact statement ("EIS") "shall provide full
and fair discussion of significant environmental impacts and
shall inform decisionmakers and the public of the reasonable
alternatives which would avoid or minimize adverse impacts
or enhance the quality of the human environment." 40 C.F.R.
§ 1502.1; *Nw. Environ. Advocates*, 460 F.3d at 1134. By

focusing agency and public attention on the environmental effects of proposed agency action, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321 and 40 C.F.R. § 1502.9(c)).

Under NEPA, agencies must not only perform EISs prior to taking federal action, but agencies must perform *supplemental* EISs whenever

> (i)   The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

> (ii)   There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1).

### 1.   "Substantial Changes" in the Resource Management Plans

BLM concedes it did not conduct a "NEPA analysis" (requiring it to, *inter alia*, perform an EA, issue an EIS or a Finding of No Significant Impact, and seek public input) prior to implementing its 2001 and 2003 ASR Decisions regarding the red tree vole. BLM argues that changes in agency policy do not always require NEPA analysis. This is correct. The Supreme Court opined in *Marsh* that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." 490 U.S. at 373. However, NEPA requires an agency to take a "hard look" at potential environmental consequences before taking action, *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983), and if the proposed action might significantly affect the quality of the environment, a supplemental EIS is

required. *Marsh*, 490 U.S. at 374; *Price Road Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997).

**[13]** BLM contends the ASR Decisions were not agency "actions" but merely implementations of an already established—and EIS-supported—agency policy (i.e., the ASR process). This argument sounds suspiciously similar to BLM's attempt to define the decisions as plan maintenance actions rather than plan amendments under FLPMA, and it fails for the same reasons: (1) BLM's actions amend, not merely maintain, the resource management plans, and (2) the ASR Decisions were rejected in the 2000 FSEIS. Indeed, for reasons explained in Part IV, *supra*, the ASR decisions changed the resource management plans substantially, and BLM was required to conduct NEPA analyses prior to implementing those changes.

BLM contends the Supreme Court's decision in *S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"), requires us to treat the 2001 ROD, and *not* the ASR Decisions, as the final "agency action." If true, this would change our analysis considerably because the NEPA requirements only apply to "major Federal actions." *SUWA*, 542 U.S. at 72 (quoting 42 U.S.C. § 4332(2)); *see also Marsh*, 490 U.S. at 374 (EIS supplementation is necessary only "if there remains major Federal action to occur"). However, *SUWA* does not support BLM's position; indeed, it weakens it.

In *SUWA*, environmental groups sought to compel BLM to perform a supplemental NEPA analysis in an area where a recent increase in off-road vehicle use had affected the environment. The Supreme Court disagreed with the environmental groups, opining:

> although the "[a]pproval of a [land use plan]" is a "major Federal action" requiring an EIS, 43 CFR § 1601.0-6 (2003), that action is completed when the

plan is approved. The land use plan is the proposed action contemplated by the regulation. There is no ongoing major Federal action that could require supplementation (though BLM is required to perform additional NEPA analyses if a plan is amended or revised, see §§ 1610.5-5, 5-6).

542 U.S. at 73.

**[14]** Emphasizing that an agency action is completed when a land use plan is approved, BLM urges us to hold that approval of the Roseburg and Medford resource management plans in 1995, and the 2001 ROD amending them, are the relevant federal actions for purposes of NEPA compliance. For reasons discussed heretofore, however, BLM cannot sustain the argument that the ASR Decisions were made pursuant to a pre-approved and EIS-supported plan. On the contrary, the decisions amended the management plans by adopting policies unequivocally rejected in previous agency actions and scientific analyses. The Court's holding in the last line of the above-quoted passage is clear: when amending a resource management plan—as defined in 43 C.F.R. § 1610.5-5—an agency must perform supplemental NEPA analysis. Because the ASR Decisions trigger the § 1610.5-5 requirements under FLPMA, they also trigger the NEPA requirements under 40 C.F.R. § 1502.9(c)(1)(i).

### 2.   "Significant New Circumstances or Information."

**[15]** The second prong of 40 C.F.R. § 1502.9(c)(1) requires a NEPA analysis if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.*; *see also SUWA*, 542 U.S. at 72 (treating 40 C.F.R. § 1502.9(c)(1)(ii) as an independent threshold that, if met, requires an agency to conduct a NEPA analysis).

**[16]** The ASR Decisions are clearly "relevant" to the environment and have a "bearing" on BLM's resource manage-

ment plans. The only inquiry is whether the ASR Decisions are the product of "significant new circumstances or information." Given BLM's decision to dramatically change the vole's Survey and Manage designation (especially in light of the 2000 FSEIS's unequivocal rejection of Alternative 2), coupled with its argument that the ASR Decisions were based on a pool of data 80% of which was not available when the 2000 FSEIS was created, the ASR Decisions and their impact can be nothing short of "significant."

Moreover, our holding in *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) counsels in favor of requiring NEPA analysis under circumstances such as these. In *Idaho Sporting*, we recognized that under 42 U.S.C. § 4332(2) an EIS "must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." 137 F.3d at 1149. We explained that "[t]he plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared." *Id.* at 1150 (emphasis in original). This is a low standard. Given how unequivocally the 2000 FSEIS rejected Alternative 2, adopting a policy within a matter of months of the 2000 FSEIS that closely resembles the rejected alternative at least raises "substantial questions" regarding its impact.

Furthermore, not only did BLM fail to conduct an EIS prior to implementing either of the ASR Decisions, it did not even conduct an EA. NEPA's implementing regulations state that EAs should be conducted "to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). Indeed, as we explained in *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000), "[b]ecause the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process." In this vein, we have held that "[i]f the pro-

posed action does not categorically require the preparation of an EIS, the agency must prepare an EA to determine whether the action will have a significant effect on the environment." *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002).

**[17]** In sum, BLM is unable to explain (1) why the ASR Decisions are not the product of "significant new circumstances or information," (2) why there were not "substantial questions regarding whether the ASR Decisions would have a significant effect," and (3) why it did not at least conduct a environmental assessments to answer these questions. For each of these reasons, BLM's 2001 and 2003 ASR Decisions regarding the red tree vole are invalid for failing to satisfy NEPA.

## VI.  THE COW CATCHER AND COTTONSNAKE TIMBER SALES

**[18]** Finally, because BLM's 2001 and 2003 ASR Decisions violated FLPMA and NEPA, we hold that the Cow Catcher and Cottonsnake timber sales are invalid and must be enjoined because they do not "conform to the approved [resource management] plan[s]." 43 C.F.R. § 1610.5-3.

The reasoning is straightforward. BLM did not conduct pre-disturbance surveys for red tree voles in preparing either the Cow Catcher or Cottonsnake timber sale. Under the Survey and Manage designations, Category C clearly requires pre-disturbance surveys to be conducted at the habitat level prior to habitat-disturbing activities. Because the 2001 and 2003 ASR Decisions are invalid and must be set aside, 5 U.S.C. § 706(2)(A), the Survey and Manage designations under the 2001 ROD are reinstated. *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."). BLM did not comply with the resource management plans and the 2001 ROD for either sale because it failed to

satisfy the Survey and Manage requirements pertaining to a Category C species. Therefore, the sales may not go forward.

## *CONCLUSION*

For the foregoing reasons, we hold that the 2001 and 2003 ASR Decisions regarding the red tree vole are invalid under both FLPMA and NEPA. We also conclude that the Cow Catcher and Cottonsnake timber sales violate federal law because they rely on the 2001 and 2003 ASR Decisions, which we find to be unlawful.

**REVERSED**.